816 P.2d 1090

The STROH BREWERY COMPANY,
Plaintiff–Appellant,

v.

DIRECTOR OF the NEW MEXICO DE-
PARTMENT OF ALCOHOLIC BEVER-
AGE CONTROL, Defendant–Appellee,

and

Gallup Sales Company, Pucci Distribut-
ing Company, Pecos Sales Company
and State Beer Distributors, Inc., Inter-
venors–Appellees.

No. 19547.

Supreme Court of New Mexico.

Aug. 12, 1991.

Rehearing Denied Sept. 13, 1991.

John T. Porter, Albuquerque, White &
Case, John J. McAvoy, Washington, D.C.,
for plaintiff-appellant, The Stroh Brewery
Co.

John B. Bigelow, Sp. Asst. Atty. Gen.,
Santa Fe, for defendant-appellee Dept. of
Alcoholic Beverage Control.

O.R. Adams, Albuquerque, for inter-
venors-appellees.

OPINION

SOSA, Chief Justice.

Stroh Brewery Company (Stroh) appeals
summary judgment granted to the Director
of the New Mexico Department of Alcohol-
ic Beverage Control (the Director), award-
ing the Director nearly $18 million in dam-
ages plus interest. The damages represent
the court's determination of the difference
between the price at which Stroh sold beer
in New Mexico between 1979 and 1985 and
the price at which Stroh allegedly was sup-
posed to sell its beer under statutes dis-
cussed below. Intervenors are various

wholesale liquor distributors allegedly harmed by Stroh's action in selling them beer in violation of the statutes. Intervenors and the Director have agreed among themselves to divide equally any judgment enforced against Stroh. For brevity we will refer to the appellees as the Director; the Director and the Intervenors advance much the same arguments on appeal.

We break down our discussion of this long, complex case into the following segments:

(1) In 1979, Stroh's predecessor in this action filed a complaint seeking a declaratory judgment and injunctive relief, alleging that the price affirmation requirement of the 1979 "Discrimination in Selling Act"[1] (the 1979 law) violated the Commerce Clause of the United States Constitution.

(2) The trial court entered a preliminary injunction temporarily enjoining the Director from enforcing the law, contingent upon Stroh's predecessor executing a bond, the pertinent terms of which were as follows:

> [Stroh agrees to pay] the amount representing the difference between the prices at which [Stroh] has sold beer to wholesalers and distributors in New Mexico during the pendency of the injunction, and the price at which [Stroh] would have been required to sell the same beer under the requirements of [the 1979 law], with interest ... if and only if, it should be finally decided by the Court that [the 1979 law] is valid and the preliminary injunction should not have been entered.

(3) The trial court then issued a memorandum opinion on January 7, 1980, granting summary judgment to the Director, upholding the constitutionality of the 1979 law in reliance on *Joseph E. Seagram &*

*Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966) (*Seagram*) (upholding New York's retrospective price affirmation law).

(4) Stroh's predecessor appealed the January 7, 1980 summary judgment. The court continued the preliminary injunction bond as a supersedeas bond during the pendency of the appeal. While the appeal was pending, the Legislature repealed the 1979 law and enacted a new version of the prior statute—the 1981 law.[2]

(5) For purposes of this appeal, the pertinent portions of the 1979 and 1981 laws, respectively, are as follows:

*Section 60–12–6 [the 1979 law]—Filing of affirmation* There shall be filed in connection with * * * the schedule filed for a brand of alcoholic liquor, an affirmation duly verified by the owner of the brand of alcoholic liquor that the bottle and case price * * * to wholesalers * * * is no higher than the lowest price at which such item of liquor was sold by the brand owner * * * to any wholesaler anywhere in any other state * * * at any time during the calendar month immediately preceding the month in which the schedule is filed.

*Section 60–8A–15 [the 1981 law]—Filing of affirmation* The owner of a brand of alcoholic beverages shall file as part of the schedule a verified affirmation that the price to New Mexico wholesalers is no greater than the lowest price at which the item of alcoholic beverages is sold by the brand owner * * * to any wholesaler anywhere in any other state * * *.

Thus the principle difference between the two statutes was that in the 1979 law the comparison period for affirmed prices was tied to the prior month, while for the 1981 law there was a contemporaneous price affirmation requirement.[3]

---

**1.** 1967 N.M. Laws ch. 269 §§ 1–10 (formerly codified at NMSA 1978, §§ 60–12–1 to –10) (Orig.Pamp. & Cum.Supp.1979), repealed by 1981 N.M. Laws ch. 39, 128. *See infra* note 2 at 2.

**2.** 1981 N.M. Laws ch. 39, §§ 1–130, formerly codified at NMSA 1978, §§ 60–8A–12 to 60–8A–

19 (Cum.Supp.1981). The 1979 law was repealed in § 128.

**3.** The 1981 law also provided: "Nothing contained [in the 1981 law] shall prevent differentials in price which make only due allowance for differences in state taxes and fees and in the actual cost of delivery." 1981 N.M.Laws ch. 39, § 67. There was also a severability clause in

(6) On July 21, 1983, we affirmed the trial court's January 7, 1980 summary judgment. *United States Brewers Ass'n v. Director of N.M. Dep't of Alcoholic Beverage Control,* 100 N.M. 216, 668 P.2d 1093 (1983), *appeal dismissed,* 465 U.S. 1093, 104 S.Ct. 1581, 80 L.Ed.2d 115 (1984). We reasoned that the trial court had correctly applied the *Seagram* holding. *Id.* 100 N.M. at 220–21, 668 P.2d at 1097–98. We held that *Seagram* was dispositive and remanded the case for further proceedings. *Id.* The constitutionality of the 1981 law was not before us in *United States Brewers Ass'n.* Stroh[4] appealed our decision to the Supreme Court, but the appeal was dismissed for lack of a substantial federal question. *United States Brewers Ass'n v. Rodriguez,* 465 U.S. 1093, 104 S.Ct. 1581, 80 L.Ed.2d 115 (1984).

(7) On June 14, 1985, the 1981 law was amended to exclude beer from the price affirmation requirement.[5] Hence Stroh's liability, if any, under either the 1979 or 1981 laws, ceased when the new statute went into effect. Prior to the effective date of the new statute, on February 21, 1985, the trial court dissolved both the injunction and the stay of enforcement which had been in effect pending appeal and remand. The parties agree that the maximum damage liability period, if any, runs from June 15, 1979, through February 21, 1985. Stroh contends this maximum period is inapplicable.

(8) During the period when *United States Brewers Ass'n* was on remand to the trial court, the United States Supreme Court issued two opinions decisively changing the law on the subject of pricing affirmation requirements in statutes similar to the 1979 and 1981 laws. First,[6] in *Brown–Forman Distillers Corp. v. New York State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), the Court struck down New York's prospective price affirmation statute.[7] Second, in *Healy v. Beer Institute,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (*Healy II*), the Court overruled *Seagram* and declared all pricing affirmation statutes unconstitutional. 491 U.S. at 343, 109 S.Ct. at 2502–03.

(9) The parties then moved again for summary judgment, with Stroh arguing that after *Healy II* the 1979 law had been shown to be "finally invalid" under the terms of the bond, and thus Stroh had no liability under the bond. Although conceding that the 1981 law was unconstitutional because of *Healy II,* the Director nonetheless argues that the 1979 law entitled it to damages from 1979 to 1985, even

---

the act: "If any part * * * of this act is invalid, the remainder * * * shall not be affected." *Id.,* § 129. Stroh contends that this clause has the effect of saving the repealing section from constitutional infirmity and thus argues that if the pricing affirmation section of the 1981 law as written was unconstitutional, the repealing section nonetheless survived and thus effectively repealed the 1979 law. Therefore, Stroh argues, the 1979 law could not have revived during any period in which the 1981 law was unconstitutional. See discussion *infra* note 8, at ——, 816 P.2d at 1100.

4. By this point in time, Stroh, which by now had acquired the assets of its predecessor in interest, had been substituted by our order as plaintiff-appellant in the appeal before us.

5. 1985 N.M. Laws ch. 5, §§ 1–5; NMSA 1978, §§ 60–8A–12 to –18 (Cum.Supp.1986).

6. Pending appeal before us, the Supreme Court decided *Healy v. United States Brewers Association,* 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983) (*Healy I*). In that decision the Court

upheld the Second Circuit's invalidating Connecticut's prospective price affirmation statute.

7. Both *Brown–Forman* and *Healy I,* note 6, above, effectively invalidated statutes that obligated a seller to file an affirmation on price at the beginning of each calendar month. For this reason the Court considered the statutes "prospective." The parties to the case at bar have disagreed over whether the 1981 law was "prospective" (Stroh) or "concurrent" (the Director).

The Court in *Brown–Forman* all but held that *any* price affirmation statute, prospective or retrospective, was invalid. In *Brown–Forman Corp. v. New Mexico Dep't of Alcoholic Beverages,* 672 F.Supp. 1383 (D.N.M.1987), the court found that the 1981 law was "concurrent," but on the strength of the Supreme Court's *Brown–Forman* decision opined that any price affirmation statute would fail to pass constitutional muster, and struck down the 1981 law. 672 F.Supp. at 1385–86. The United States District Court's prediction was vindicated by the Supreme Court's opinion in *Healy v. Beer Institute,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (*Healy II*).

though the 1979 law was arguably in effect only until 1981, when the 1981 law purportedly repealed the 1979 law. The Director argued both that the 1979 law revived when the 1981 law became unconstitutional and that our holding in *United States Brewers Ass'n*, upholding the 1979 law, was the law of the case.

(10) The trial court agreed with the Director and granted summary judgment, which Stroh now appeals. The trial court ruled, *inter alia*, "The 1979 law was constitutional and valid and provided a continuing basis for Stroh's liability.... [T]he validity of the 1979 law is a closed question * * *. Because the 1979 law is valid, Stroh is liable upon its bond and all that remains is to determine the exact amount which Stroh owes the State."

(11) On appeal, Stroh asserts the following:

(a) The 1979 law has been finally decided to be invalid. Thus, Stroh never had and does not have now any liability under the bond;

(b) Even if it should be decided that the 1979 law were valid, that law was repealed by the 1981 law, and, not having revived, imposes no liability on Stroh past the date of its repeal;[8]

The parties advance the following arguments on appeal. Stroh argues that our holding in *United States Brewers Ass'n* is not the law of the case and should not be applied as such in determining if Stroh is liable under the bond. Stroh argues that, following our holdings in *Reese v. State*, 106 N.M. 505, 506, 745 P.2d 1153, 1154 (1987), and *Moya v. Catholic Archdiocese*, 107 N.M. 245, 248, 755 P.2d 583, 586 (1988), the law of the case doctrine in New Mexico cannot be used "where the former appellate decision was clearly, palpably, or manifestly erroneous * * *." (quoting *Reese*, 106 N.M. at 507, 745 P.2d at 1155). Under the supremacy clause of the United States Constitution, Stroh argues, we must follow the mandate of *Healy II* in holding the 1979 law invalid, and thus absolve Stroh from any liability under the bond.

The Director counters by arguing that under the Supreme Court's recent holding in *American Trucking Associations v. Smith*, 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990), *Healy II* should not be given "retroactive effect." Consequently, the Director argues, our prior ruling on the 1979 law in *United States Brewers Ass'n* is the law of the case and must be given effect now, regardless of any subsequent invalidation of the 1979 law by *Healy II*.[9] The Director also urges a different reading of New Mexico law of the case doctrine than that asserted by Stroh. By that doctrine, the Director argues, we correctly decided *United States Brewers Ass'n* based on *Seagram*, the applicable governing precedent at the time of our decision. Hence, our decision in the case, establishing the law of the case, was not "clearly, palpably or manifestly erroneous or unjust."

While the statement of this case has been difficult, our resolution of it is relatively simple. It is clear that *Healy II* has in effect "finally invalidated" the 1979 law. Yet, there is nothing in the *Healy II* opinion to indicate that the holding is to have retroactive effect. To the contrary, the court stated that *Seagram* "is no longer good law," 491 U.S. at 343, 109 S.Ct. at 2502, which is the language of prospectivity, not retroactivity.

Second, while we agree with Stroh that *American Trucking Assn's v. Smith* is not on all fours with the instant case, nonetheless we can glean valuable instruction from that case to guide us in resolving the case at bar. For our purposes, the important point about *American Trucking* is that it did not overrule *Chevron Oil Co. v.*

---

**8.** Stroh asserts that the trial court's ruling to the effect that the 1979 law "provided a continuing basis for Stroh's liability * * * through February 21, 1985[,]" can only mean that the trial court accepted the Director's argument that the 1979 law revived after the 1981 law was found unconstitutional. The Director's argument can have merit only if the repealing section of the 1981 law did not fall with the price affirmation requirement of that law. *See supra* note 3, at 469, 816 P.2d at 1091.

**9.** The Director reluctantly concedes that "the 1979 law could probably fail under *Healy II*."

*Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). On the contrary, the Court in *American Trucking* used the decision in *Chevron* to reach its conclusion. *See American Trucking,* 496 U.S. at ——, 110 S.Ct. at 2342–43.

Reading *Chevron* in the light of *American Trucking,* we make the following conclusions as to the nonretroactive effect of *Healy II.* *Chevron's* first criterion for nonretroactivity is: "[T]he decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." 404 U.S. at 106, 92 S.Ct. at 355 (citations omitted). In *Healy II* the court held, "[T]o the extent that *Seagram* holds that retrospective affirmation statutes do not facially violate the Commerce Clause, it is no longer good law." 491 U.S. at 343, 109 S.Ct. at 2502.

As noted *supra* note 7, at 470, 816 P.2d at 1092, the parties disagree over whether the 1981 law was prospective or concurrent. Clearly the 1979 law was retrospective. The United States District Court for the District of New Mexico, in invalidating the 1981 law, considered the 1981 law concurrent, but opined that *any* price affirmation statute, however characterized, would be unconstitutional. *Brown–Forman Corp. v. New Mexico Dep't of Alcoholic Beverage Control,* 672 F.Supp. 1383, 1385–86 (D.N.M.1987).

We do not read the court's statement in *Healy II,* "[T]o the extent that *Seagram* holds that retrospective affirmation statutes do not facially violate the Commerce Clause, it is no longer good law," 491 U.S. at 343, 109 S.Ct. at 2502, as meaning that some other type of price affirmation statute would be valid. The court's reasoning in *Healy II* swept a broad scythe of invalidity under the roots of *all* pricing affirmation statues. *See, e.g., Healy II,* 491 U.S. at 343 n. 15, 109 S.Ct. at 2503 n. 15 (quoting with approval the results of scholarship confirming that both prospective and retrospective price affirmation statutes unduly burden interstate commerce).

Merely because *Seagram* was involved only with a retrospective statute, we do not hesitate to conclude that the 1981 law, however it may be characterized (concurrent versus prospective), was swept away in the flood that washed *Seagram* from the shores of still valid decisions. Therefore, for purposes of the first criterion of *Chevron's* nonretroactivity test, *Healy II* established a new principle of law.

The second *Chevron* criterion requires more analysis. By that criterion, the court stated, " '[W]e must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' " 404 U.S. at 106–07, 92 S.Ct. at 355 (quoting *Linkletter v. Walker,* 381 U.S. 618, 629, 85 S.Ct. 1731, 1738, 14 L.Ed.2d 601 (1965)). *Linkletter* was a criminal case in which the issue was whether the court's newly announced rule in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (exclusion of evidence seized in violation of Fourth Amendment) was to be applied retrospectively. The court in *Linkletter* answered in the negative.

The court reasoned that "*Mapp* had as its prime purpose the enforcement of the Fourth Amendment through the inclusion of the exclusionary rule within its rights * * *. We cannot say that this purpose would be advanced by making the rule retrospective." 381 U.S. at 636–37, 85 S.Ct. at 1741–42. In making this determination, the court looked to the practical effects that a retroactive application of *Mapp* would have.

The misconduct of the police prior to *Mapp* has already occurred and will not be corrected by releasing the prisoners involved. Nor would it add harmony to the delicate state-federal relationship of which we have spoken as part and parcel of the purpose of *Mapp.* Finally, the ruptured privacy of the victims' homes and effects cannot be restored. Reparation comes too late.

*Id.* at 637, 85 S.Ct. at 1742.

Having read *Chevron* in the light of *Linkletter,* we next factor in the court's

explanation of *Chevron's* second criterion as expressed in *American Trucking.* There the court stated, in determining whether the second criterion applied in that case:

> [T]he purpose of the Commerce Clause does not dictate retroactive application of [*American Trucking Assn's, v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) ], since such application would not tend to deter future free trade violations by the States. The [highway-use equalization tax at issue in *American Trucking Assn's v. Smith* ] when enacted was entirely consistent with the [Court's prior cases allowing the tax], and it is not the Clause's purpose to prevent legitimate state taxation of interstate commerce.[10]

496 U.S. at ——, 110 S.Ct. at 2332.

Applying the court's construction of the second criterion for nonretroactivity as considered and applied in *Chevron, Linkletter,* and *American Trucking Assn's v. Smith,* we conclude that retroactive application of *Healy II* to the case at bar would serve no purpose advanced by the Commerce Clause. Especially in New Mexico, price affirmation requirements as they apply to beer have been essentially a dead letter since June 14, 1985. *See supra* note 5, at 470, 816 P.2d at 1092. No purpose of the Commerce Clause would be served by retroactively applying *Healy II* at this late date, as such application, to paraphrase *American Trucking Assn's v. Smith,* "would not tend to deter future [acts of discrimination against interstate sellers of beer], and it is not the Clause's purpose to prevent legitimate [state regulation of] interstate commerce." 496 U.S. at ——, 110 S.Ct. at 2332.

As the court reasoned in *Linkletter,* the damage done by *Seagram,* which upheld New York's retrospective price affirmation law, cannot now be undone. In overruling *Seagram,* the court in *Healy II* addressed itself, for our purposes, to a twofold evil: (1) potential and incidental involvement by one state in another state's pricing laws, or "price gridlock," as the court called it, 491 U.S. at 340, 109 S.Ct. at 2501, and (2) "discrimination against brewers and shippers of beer engaged in interstate commerce." *Id.* at 340, 109 S.Ct. at 2501. The practical effect of these evils cannot now be alleviated; nor would a retroactive application of *Healy II* prevent such evils in the future. Consequently, applying *Healy II* retroactively would advance no purpose served by the Commerce Clause. We thus hold that *Chevron's* second criterion has been satisfied.

We turn now to *Chevron's* third criterion. In the present case, a number of other brewers have already settled the cases against them and have presumably paid penalties. To permit Stroh to be the only brewer to have evaded the strictures of the 1979 law would likely subject the Director to charges that he has dealt with these brewers inequitably. This could well result in the same potential threat that caused the court in *American Trucking Assn's v. Smith* to deny full retroactivity to its *Scheiner* holding. *See American Trucking Assn's v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). In *American Trucking Assn's v. Smith,* the Court feared that a full, retroactively applied refund "could deplete the state treasury, thus threatening the State's current operations and future plans * * * [and could lead to] potentially significant administrative costs." 496 U.S. at ——, 110 S.Ct. at 2333.

---

**10.** In *American Trucking Assn's. v. Smith,* 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1989), the truckers sought a refund of a highway-use equalization tax imposed by the state of Arkansas following the court's invalidation of unapportioned flat taxes in *American Trucking Assn's. v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987). In *American Trucking Assn's v. Smith,* the court, in a four-vote plurality opinion in which Justice Scalia concurred on other grounds, held that *Scheiner* did not have

retroactive application, relying on the three criteria enunciated in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). Heretofore in our opinion, *"American Trucking"* has meant *American Trucking Assn's. v. Smith.* From this point on in our opinion, we will distinguish between the two American trucking cases by including the respective names of the adverse parties, Smith or Scheiner, as appropriate.

While the threat to the state's purse may not be as significant here, the important point is that to single out Stroh for preferred treatment by holding *Healy II* retroactive only as to Stroh, would undoubtedly produce inequitable results and subject the State of New Mexico to liability. The Court's decision in *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco,* 495 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) suggests that a state in New Mexico's position here may be liable to all those affected by its erroneous administration of a statute that has been found violative of the Commerce Clause and by its collection of any penalties thereunder, whether through settlement or otherwise. Hence, we are justified, as was the Court in *American Trucking Assn's v. Smith,* to regard any retroactive application of *Healy II* as potentially productive of both inequitable results and harm to the State of New Mexico, thus calling for nonretroactive application, under *Chevron,* of the *Healy II* holding.

By the same token, we are justified in rejecting the suggestion that our holding in *United States Brewers Ass'n* "was clearly, palpably, or manifestly erroneous or unjust." *See Moya,* 107 N.M. at 248, 755 P.2d at 586. Thus, even if, as Stroh suggests, *Moya* and *Reese* carve exceptions out of established law of the case doctrine, we do not find that such exceptions apply here. The reason is simple. Neither our decision in *United States Brewers Ass'n,* nor the trial court's ruling appealed in that case, were "clearly, palpably, or manifestly erroneous," as the Supreme Court itself has only just held that *Seagram* is no longer good law. How could a decision based on the right law at that time now be a "manifestly erroneous" decision?

Further, neither our decision in *United States Brewers Ass'n,* nor the trial court's ruling appealed in that case, have produced an unjust result, when measured against the treatment accorded to the other brewers whose conduct was censured by the 1979 law. On the contrary, as we have reasoned above in our consideration of *American Trucking Assn's v. Smith,* to deny law of the case finality to *United States Brewers Ass'n* would *produce* an injustice rather than *undo* one.

It should be kept in mind that exceptions to law of the case doctrine that are based on the "clearly erroneous" concept are usually relied on to reverse or set aside a previous decision. *See, e.g.,* Note, *Successive Appeals and the Law of the Case,* 62 Harv.L.Rev. 286, 288 (1948) ("[A]ll courts would probably reverse the prior ruling if convinced that it stated a bad rule of law and should be overruled"). Such is not the question before us. There is no question but that *United States Brewers Ass'n* is now "bad law." Yet, the question before us is not whether that decision should be reversed or set aside, but whether the decision's error has retroactive significance under the facts of this case. We hold that it does not.

Therefore, under the law of this case, *Healy II* does not invalidate the 1979 law. As the trial court correctly ruled, the law of this case is that dictated by our holding in *United States Brewers Ass'n* and the underlying trial court decision appealed in that case. The recent case of *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), notwithstanding, which we find inapplicable, we affirm the judgment below on the central issue discussed above.

We have reviewed Stroh's contentions as to damages and the repeal of the 1979 law and conclude that its contentions on those issues are without merit. Thus we affirm the trial court's judgment in its entirety.

IT IS SO ORDERED.

BACA, J., concurs.

FRANCHINI, J., specially concurs.

RANSOM and MONTGOMERY, JJ., dissent.

FRANCHINI, Justice (specially concurring).

I concur entirely in the rationale and result of Chief Justice Sosa's opinion. I write specially only to dispel any conjecture that the recent decision of the United

States Supreme Court in *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), in any way modifies or nullifies today's decision. The matter before this court is distinguishable from *Beam* in several respects.

In *Beam,* the Court considered the retroactive application of *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), to an action by a manufacturer of Kentucky Bourbon for a refund of taxes paid under a Georgia state law in effect prior to the *Bacchus* decision. Framing the question before it as "whether it is error to refuse to apply a rule of federal law retroactively after the case announcing the rule has already done so[,]" *Beam,* — U.S. at —, 111 S.Ct. at 2446, the Court read *Bacchus* to hold that as to choice of law, its rule was to apply retroactively and deemed it inappropriate to deviate from that rule.

Here, we consider whether *Healy v. Beer Institute,* 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (*Healy II*), should be given retroactive effect. Chief Justice Sosa observes that "there is nothing in the *Healy II* opinion to indicate that the holding is to have retroactive effect." *Supra* at 471, 816 P.2d at 1093. *Healy II* is void of the indications of retroactivity that the Court found in *Bacchus,* thus inviting an analysis in this case distinct from the constrained analysis imposed in *Beam.*

Further, the Court concedes that "[t]he grounds for our decision today are narrow. They are confined entirely to an issue of choice of law: when the Court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata." *Beam,* — U.S. at —, 111 S.Ct. at 2448. Procedurally, the posture of the case before us is distinct from *Beam.* The petitioner in *Beam* brought its action in the wake of the *Bacchus* decision rendered in 1984, and had been involved in no litigation nor been subject to any decisions rendered regarding the challenged tax. The matter before us today has been in litigation since 1979, and Stroh is subject to

our decision in *United States Brewers Association v. Director of N.M. Department of Alcoholic Beverage Control,* 100 N.M. 216, 668 P.2d 1093 (1983), *appeal dismissed sub nom. United States Brewers Association v. Rodriguez,* 465 U.S. 1093, 104 S.Ct. 1581, 80 L.Ed.2d 115 (1984), which we find to be controlling here as the law of the case. Application of the law of the case doctrine in this matter places this case squarely in the context of those cases beyond the narrow scope of the *Beam* decision.

The appropriate analysis here is the three-pronged criteria developed in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). The Court declines to apply the *Chevron* analysis in *Beam* claiming that "principles of equality and stare decisis here [prevail] over any claim based on a *Chevron Oil* analysis." *Beam,* — U.S. at —, 111 S.Ct. at 2446. Significantly, *Beam* does not overrule *Chevron.* Given the prospective nature of *Healy II,* and the distinct procedural posture of *Strohs* in this case, *Beam's* rejection of the *Chevron* analysis in no way undermines the validity of the decision we render today. I therefore specially concur.

MONTGOMERY, Justice (dissenting).

The question in this case is whether the plaintiff, Stroh, should be held liable on its preliminary injunction bond. That depends, of course, on the wording of the condition in the bond triggering the principal's (Stroh's) liability. As quoted in the majority opinion, the condition is that "it * * * be finally decided by the Court that [the 1979 law] is valid * * *." The district court twice decided the law was valid; this Court affirmed one of those decisions; and the question before us now is whether the second decision should be affirmed or should be reversed on the ground that, after all, the 1979 law is not and was not valid.

The majority opinion answers this question in ways that I find wholly unsatisfactory. The majority ignores the purpose of a preliminary injunction bond, indemnifying the Director and the wholesalers from

harm they have not suffered and penalizing Stroh for conduct that was entirely lawful and appropriate. The majority reveals a view of the law that I believe is fundamentally wrong and unrealistic. It misapplies the law of the case doctrine, in the face of supervening federal law and in violation of the Supremacy Clause of the Constitution, and decides an issue of federal law—the "retroactivity" of a decision by the United States Supreme Court—in a way that is contrary to any reasoned application of controlling Supreme Court precedents on the retroactivity question. For all of these reasons, I respectfully dissent.

## I.

One way to approach the question before us is to consider the purpose of a preliminary injunction bond. Under our Rule 1–066(C), a preliminary injunction bond is given "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained * * *." SCRA 1986, 1–066(C). Wright and Miller, describing the corresponding federal rule, Fed.R.Civ.P. 65(c), state that the purpose of the rule "is to enable a restrained or enjoined party to secure indemnification for the costs * * * and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2954, at 523 (1973). This gives rise to two further questions: whether the preliminary injunction was wrongfully issued and whether the Director (or anyone else) suffered a pecuniary injury during the period in which the injunction remained in effect.

A conclusion that the Director was wrongfully enjoined in 1979 can only be reached by taking the position that Stroh's conduct during the pendency of the injunction was contrary to law and that the Director had every right to enforce the statute. Similarly, to say that the Director (or the beer wholesalers, or beer retailers, or

beer-consuming public) suffered a pecuniary injury during the 1979–85 period entails the proposition that the 1979 law was valid at that time and somehow became invalid later on when, in 1989, the Supreme Court decided *Healy II*.[1] While it may be begging the question to frame the issue in these ways, doing so highlights for me the illogic and injustice of the majority's position that Stroh's conduct, which was perfectly consistent with the Commerce Clause in the Constitution as now authoritatively construed, was somehow wrongful and should not have been undertaken.

*Healy II* construed the Commerce Clause to mean that, in the present context, state price-affirmation laws like the 1979 law impermissibly burden interstate commerce. Here was a company that took the same position from the very beginning, insisting that the law of this state (and many other states like it) could not require the company to sell its beer at a particular price pegged to the price in other states. The company's position was consistent with the mandate of the Constitution, and the company proceeded to sell its beer for whatever price it determined in the market. So did all the other brewers, at least as far as we are informed on this appeal. The other brewers ultimately decided that they wanted to buy their peace and get out of the litigation, so they paid some money to the state and then (since the law had been repealed) continued to sell their beer as they had before. Stroh, however, had the courage of its convictions and continued to assert the invalidity of the law, even though it had been upheld by this Court. Events proved that this Court had been wrong and Stroh had been right. Stroh had acted consistently with the Constitution and its conduct had conformed with the policy implemented in the Commerce Clause. To hold now that Stroh should be penalized for this conduct is, to my way of thinking, seriously inconsistent with the constitutional policy spelled out in *Healy II*.[2]

---

1. *Healy v. Beer Inst.*, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).

2. The Supreme Court said, for example: "[T]he practical effect of this affirmation law, in conjunction with the many other beer pricing and

Not only does the majority opinion penalize Stroh for conduct that turned out to be completely lawful; it awards a windfall to both the Director and the wholesalers that I believe is entirely unjustified. The Director had no statutory entitlement to collect money (damages, reparations, penalties, or anything else) from a brewer who did not comply with the price-affirmation law. *See* NMSA 1978, § 60–12–9 (Orig. Pamp.) (repealed July 1, 1981) (violation of Discrimination in Selling Act is violation of Liquor Control Act; violator is also liable for suspension of license); NMSA 1978, § 60–10–39 (Orig.Pamp.) (repealed July 1, 1981) (violation of Liquor Control Act is misdemeanor punishable, if violator is corporation, by fine of not more than $1,000).[3] The parties agreed to a bond as a condition for issuance of the preliminary injunction, but there was no potential liability to the Director secured by the bond; it was simply the *quid pro quo* for the Director's agreeing to the injunction.

As for the wholesalers, they became entitled to a share of any potential bond proceeds as the result of a deal they made with the Director, after they intervened, to divide any proceeds Stroh might have to pay under the bond. Absent the bond, the wholesalers would not have been entitled to collect money from Stroh by virtue of any statutory remedy; they would have had to sue for damages resulting from Stroh's charging a price higher than that prescribed by the 1979 law. Since, as things turned out, Stroh was charging a price *permitted* by federal law, the wholesalers were not harmed and cannot—in any meaningful sense, apart from the law's having previously (and erroneously) been declared "valid"—claim to have suffered any damages.

II.

The majority opinion displays a view of the nature of the law that I find altogether unacceptable. That is, the majority opinion treats "the law" as it "existed" in 1979–85 as some kind of immutable object, something like an architect's blueprint—"a Platonic or ideal existence"[4]—against which parties' conduct is to be measured to see whether that conduct was right or wrong. According to this view, "the law" contained in *Seagram*[5] on the constitutionality of price-affirmation statutes made our own 1979 price-affirmation statute constitutional, Stroh's conduct unlawful, and the order enjoining the Director wrongful. When *Healy II* was decided, "the law" was changed—the dimensions and shape of the blueprint were altered—so that, when assessed under the new configuration, Stroh's position suddenly became correct, even though it previously had been incongruent with the shape of "the law" as it stood prior to *Healy II*.

I cannot accept this reified conception of "the law" as something that has one shape one day and another the next. The law is not a "brooding omnipresence in the sky,"[6] nor is it something chiseled into stone tablets somewhere. It is a set of precepts—of rules, principles, maxims, guidelines—that *do* change from time to time and that govern the conduct and relationships of citizens. The task of lawyers and judges is to determine which of these changing precepts should be applied to the resolution of a particular dispute and which should not—hopefully for good, policy-based reasons.

affirmation laws that have been or might be enacted throughout the country, is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude." *Healy II*, 491 U.S. at 337, 109 S.Ct. at 2500.

**3.** The Director apparently did not know what to do with the money collected from the other brewers when they settled with him, so the settlement agreements provided simply that the settlement proceeds were to be held in trust by the Attorney General and distributed "for the benefit of the citizens of New Mexico as the Attorney General may deem appropriate."

**4.** *Great Northern Ry. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 365, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) (Cardozo, J.).

**5.** *Joseph E. Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966).

**6.** *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting).

The precept laid down by *Seagram* was that price-affirmation laws were permissible. No one would think of applying this precept today; it has been overruled by *Healy II.* The precept in the latter case is that another, overarching precept—the "negative implication" of the Commerce Clause—forbids this kind of statute. Whether we should apply the *Healy II* and Commerce Clause precepts depends on how we view certain other precepts, namely, those predicated on principles of finality, as embodied here in the law of the case doctrine, and those prescribing when a new decision should or should not be given "retroactive" effect.

### III.

Turning to the law of the case, I certainly agree that principles of finality of litigation are important and should be applied in the resolution of a dispute—except when there is good reason not to do so. The law of the case doctrine prevents relitigation of issues already determined; the policy underlying the doctrine is to conserve judicial and litigants' resources by avoiding repetitious litigation. In this case the doctrine does not apply, because no one is attempting to relitigate whether the 1979 law is or is not invalid under the Constitution. All parties concede, as they must, that price-affirmation statutes like the 1979 law are invalid.[7] The only question is whether, despite this concession, the 1979 law should be deemed valid now because we held it valid before. In this situation, where a controlling decision by the United States Supreme Court on a matter of federal constitutional law has intervened since our previous decision, I believe that the discretionary policy embodied in the law of the case doctrine should not be invoked on a subsequent appeal in the same case as the one in which the original, erroneous decision was announced.

As we said in *Reese,*[8] in an opinion by Chief Justice (then Senior Justice) Sosa,

"The doctrine of the law of the case is not a rule to which we are bound by any legislative enactment. In so far (sic) as we are bound, it is because we have so bound ourselves, or choose so to bind ourselves by our decisions * * *. [W]hen we conclude that a former decision is erroneous, and we still have the opportunity to correct it as affecting those parties whose interests are concerned in the original ruling, we should apply the law of the land rather than the law of the case * * *. [W]e feel that is better and more just to apply in this case what we find to be the law of the land."

106 N.M. at 506, 745 P.2d at 1154 (quoting *Farmers' State Bank v. Clayton Nat'l Bank,* 31 N.M. 344, 355–56, 245 P. 543, 548 (1925)). We went on to say that this was "in keeping with the majority understanding of the doctrine of the law of the case," which we summarized as follows:

"[S]ince the doctrine of the law of the case is merely one of practice or court policy, and not of inflexible law, so that appellate courts are not absolutely bound thereby, but may exercise a certain degree of discretion in applying it, there are many holdings in which the courts have retreated from any inflexible rule requiring the doctrine to be applied regardless of error in the former decision, and it has been said that the doctrine should not be utilized to accomplish an obvious injustice, or applied where the former appellate decision was clearly, palpably, or manifestly erroneous or unjust."

*Id.* 106 N.M. at 507, 745 P.2d at 1155 (quoting 5 Am.Jur.2d *Appeal and Error* § 750, at 194 (1962)).

Finally, we said:

It is obvious from the above that we may deviate from the law of the case doctrine in the situation before us if to apply the doctrine would result in a manifest injustice.

---

**7.** See the majority opinion, *ante,* footnote 9.

**8.** *Reese v. State,* 106 N.M. 505, 745 P.2d 1153 (1987).

*Id.; see also Moya,*[9] 107 N.M. at 248, 755 P.2d at 586 ("[W]e will not apply that judicial doctrine [law of the case] here, where doing so might result in a manifestly unjust decision and where the essential facts have been altered by a substantial change in the evidence.").

Here, there has not been a "substantial change in the evidence"; there has been a substantial—indeed, a dispositive—change in the law. Applying the law of the case doctrine is, I believe, manifestly unjust.

To answer the majority's rhetorical question, "How could a decision based on the right law at that time now be a 'manifestly erroneous' decision?," I would point out, first, that the question further illustrates the law-as-an-object view criticized above. The "right law" in 1983, when our previous decision was rendered, was not some unchanging corpus of "the law"; it was a correct application of the then controlling constitutional precept handed down in *Seagram.* But it was nonetheless erroneous—"manifestly erroneous," if you will—because *Seagram* turned out to be wrong and Stroh, who lost in 1983, turned out to be right. To say that this Court's previous decision was wrong is not a criticism of the Court in 1983; it is simply an acknowledgement that sometimes courts reach erroneous decisions by relying on erroneous precedents. This Court cannot, or should not, be faulted for lacking omniscience in 1983, but our lack of prescience then should not be turned into a reason now for refusing to acknowledge what has happened since and for holding that Stroh—even though it was right all along and ultimately was vindicated by the United States Supreme Court—has to pay nearly

20 million dollars for the privilege of being right.

## IV.

The majority holds that Stroh is liable on its bond and offers as the primary reason for this result the proposition that *Healy II* should not be applied retroactively. Once again, this illustrates the vigor with which the majority is willing to apply the reification theory discussed above: "The law" as it stood in 1983 validated state price-affirmation statutes; in order for a statute like the 1979 law to be declared now to have been invalid then, it is necessary to hold that the new decision (*Healy II*) reached back in time and wrought some kind of change in the old law so as to render the statute invalid instead of valid.[10] But we are deciding this case *today*, not in 1983, and not in 1966 when *Seagram* was decided. We should apply today's precepts today—unless there is some good reason for not doing so. To refuse to apply the precept of *Healy II* because it was not announced until after the statute was repealed in 1985 is simply another application of the approach that "the law" has a certain shape at any given time and that shape cannot be changed by a subsequent event unless that event has "retroactive" effect.

But it is not necessary to philosophize about the nature of the law to reach the conclusion that *Healy II* should be given retroactive effect in this case; that conclusion follows readily from conventional analysis using accepted forms of legal reasoning. First, the Supreme Court has not held that its decision in *Healy II* is prospective only; in context, the quotation in the majority opinion (*Seagram* "is no longer good law") simply means that, in light of the history recounted in the Supreme

**9.** *Moya v. Catholic Archdiocese,* 107 N.M. 245, 755 P.2d 583 (1988).

**10.** The anomaly in this assertion was manifested by the Director's position in the court below, in which he *conceded* that the 1981 law was unconstitutional and yet, in practically the same breath, argued that the 1979 law was valid! He took this glaringly inconsistent position because, by affirming the invalidity of the 1981 law with its 1979–law repealer, he could claim that the earlier law remained in effect until its

later repeal in 1985 and thus, as the district court ruled, "provided a continuing basis for Stroh's liability." Like the majority, I do not reach the questions whether the severability clause in the 1981 law left the repealer intact and whether, assuming the later law was invalid, the earlier law "revived" when the later law fell. For all practical purposes, as reflected in both the majority opinion and this dissent, Stroh's liability under its bond is the same under either the 1979 law or the 1981 law.

Court's opinion, the decision in *Seagram* had to be overruled. Since the question of the retroactivity or nonretroactivity of a Supreme Court decision is an issue of federal law, *James B. Beam Distilling Co. v. Georgia,* — U.S. —, —, 111 S.Ct. 2439, 2443, 115 L.Ed.2d 481 (1991) (opinion of Souter, J.), I agree with the majority's implicit recognition that this is a point on which the Supreme Court has the last say; but I do not think it has said anything up to now. *This Court* is deciding this issue of federal law; and, with all respect, I think the majority decides it incorrectly.

Judicial decisions interpreting the Constitution, like most judicial decisions, are usually given retroactive effect. *Id.* at —, 111 S.Ct. at 2443; *United States v. Johnson,* 457 U.S. 537, 542, 102 S.Ct. 2579, 2582, 73 L.Ed.2d 202 (1982) ("Before 1965, * * * 'both the common law and our own decisions recognized a general rule of retrospective effect for the constitutional decisions of this Court * * * subject to [certain] limited exceptions.'") (quoting *Robinson v. Neil,* 409 U.S. 505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973)). Nevertheless, in civil cases there are situatins in which a decision interpreting the Constitution will not be applied retroactively. *Chevron Oil Co. v. Huson*[11] lays out the factors or criteria to be utilized in determining when a decision will not be so applied. As Justice Franchini points out in his special concurrence, *Chevron Oil* was not overruled in the very recent decision in *Beam.* However, and with utmost respect, I believe that Justice Franchini is seriously mistaken, as is the majority,[12] in his attempt to dispel any "conjecture" that *Beam* supports a result contrary to the one announced by the majority.

Although there was no majority opinion in *Beam,* six of the nine Justices voted to hold the earlier decision in *Bacchus*[13] ret-roactive to disputes arising and conduct occurring before the date of that decision. Justice Souter, writing for himself and Justice Stevens, took the position that principles of equality and *stare decisis* dictated application of a new rule, applied to the litigants in the case in which the rule is announced, to other, similarly situated litigants whose conduct antedated announcement of the new rule. They thus rejected the concept of "modified" or "selective" prospectivity. (They refused, however, to "speculate as to the grounds or propriety of pure prospectivity." — U.S. at —, 111 S.Ct. at 2448.) Since the parties' conduct in *Healy II* occurred in 1981–84 and that of the litigants in this case in 1979–85, applying the rule in *Healy II* to the former set of litigants but not the latter would appear to work just the kind of discrimination disfavored by Justices Souter and Stevens in *Beam.* I therefore assume that they would apply *Healy II* retroactively in this case to hold that the 1979 law was invalid.

Justice White concurred in the judgment in *Beam,* agreeing with Justice Souter that the litigants in *Beam* should have the benefit of the same rule as those in *Bacchus,* but he reaffirmed his view that "pure" prospectivity is proper in some cases. *Id.* — U.S. at —, 111 S.Ct. at 2449. Justices Blackmun, Marshall, and Scalia also concurred in the judgment, expressing the view that both selective prospectivity and pure prospectivity are beyond the Court's power, *id.* at —, 111 S.Ct. at 2451—that *all* decisions adjudicating a constitutional controversy should be applied retroactively.

The dissent in *Beam,* authored by Justice O'Connor and joined by Chief Justice Rehnquist and Justice Kennedy, would have applied the *Chevron Oil* analysis in deciding the retroactivity question before them. But the dissent's reasoning in *Beam,* consistent with Justice O'Connor's approach

11. 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

12. The majority's reliance on *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), is puzzling. The rationale of that case was severely undercut in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), in which the Court held that a new constitutional rule, in criminal cases, applies retroactively to all cases pending on direct review or not yet final. *See id.* at 320–22, 107 S.Ct. at 711–13.

13. *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984).

in *American Trucking Ass'ns v. Smith*,[14] placed considerable—indeed, to my mind, controlling—emphasis in reaching this result on the desirability of respecting parties' reliance on an old rule of law and not upsetting settled expectations that may have arisen based on the old rule. In the present case, as I shall explain below in connection with *American Trucking Ass'ns v. Smith*, this factor of reliance—of respecting settled expectations that may have grown up around *Seagram*—is altogether lacking. I surmise, therefore, that the dissenters in *Beam* (who, with Justice White, also composed the plurality in *Smith*) would apply the usual rule of full retroactivity in this case and find any exceptions, predicated on *Chevron Oil*, inapplicable.

As to *Chevron Oil*, I concede that two of the three factors it prescribed for determining when a new rule will be given prospective-only effect are partially satisfied by *Healy II:* The case did establish a new principle of law by overruling clear past precedent, and (since our price-affirmation laws were repealed in 1985) retrospective application of *Healy II* will not have any particular effect in furthering or retarding operation of the rule in that case (that price-affirmation laws act as an impermissible burden on interstate commerce). However, *Chevron Oil*'s first factor is not fully satisfied, because the element of the parties' reliance is missing. *See* 404 U.S. at 106, 92 S.Ct. at 355 ("[T]he decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent *on which litigants may have relied * * *.*") (emphasis added). Likewise, I cannot concede that *Chevron Oil*'s second factor is fully satisfied, because, while holding Stroh liable on its bond may not deter other states from enacting price-affirmation laws, such action is flatly inconsistent with the policy expressed in the Commerce Clause as construed in *Healy II*.

It is over the third *Chevron Oil* factor, however, that I disagree most strenuously with the majority opinion. That third criterion is "the inequity imposed by retroactive application * * * [in order to avoid] the 'injustice or hardship' by a holding of nonretroactivity." 404 U.S. at 107, 92 S.Ct. at 355. In *Chevron Oil*, the plaintiff at least arguably had relied on the then current law in failing to file suit within the time prescribed by the state statute of limitations that was applicable as a result of a new Supreme Court decision, *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969). The Court gave *Rodrigue* prospective effect only, because it would have been inequitable to deprive the plaintiff of his cause of action when he relied on the old law in failing to timely file his lawsuit. Similarly, in *American Trucking Ass'ns v. Smith* the Court held that a decision[15] invalidating a highway use equalization tax would not be applied with full retroactivity, because "invalidation of the State's HUE tax would have potentially disruptive consequences for the State and its citizens." 496 U.S. at —, 110 S.Ct. at 2333. Justice O'Connor's plurality opinion focused on the possibility that retroactive invalidation of the tax might, if a refund were required, "deplete the state treasury, thus threatening the State's current operations and future plans," and entail "potentially significant administrative costs." *Id.* "[T]he inequity of unsettling actions taken in reliance on those precedents [*i.e.*, previously established precedents overruled by a later decision] is apparent." *Id.* Justice O'Connor employed the same rationale in her dissent in *Beam*. *See* — U.S. at —, 111 S.Ct. at 2452 ("By not applying a law-changing decision retroactively, a court respects the settled expectations that have built up around the old law.").

This factor is altogether absent in the present case. At oral argument, counsel for the Director conceded that the *only* instance of reliance in this case was that our state legislature presumably relied on *Seagram* in enacting the 1979 law. (And, of course, this Court relied on *Seagram* in

**14.** 496 U.S. 167, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990).

**15.** *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987).

upholding that law.) But I do not believe that the reliance of a legislative body (or a court) is the kind of reliance *American Trucking* is talking about. In protecting the reliance interests of parties to a transaction or a lawsuit—in refusing to upset settled expectations of litigants or others—the courts are concerned about protecting the rights (or interests, or hopes, or desires) of the parties to a transaction or a dispute, which may include governmental bodies but does not include (except as reflected in actions taken in reliance on a former law, such as collection of taxes) law-prescribing assemblies or tribunals.

As I have said, there is no suggestion in this case that anyone relied on the 1979 price-affirmation law in doing anything. Stroh's predecessor sued for a declaration that the law was invalid; the Director defended; the parties worked out an agreement under which the Director would not enforce the law pending a determination of its validity and on condition that the plaintiffs would pay the difference between what they might charge under the injunction and what they could charge under the law if it were valid. No one changed his, her, or its conduct in reliance on anything that anyone else did—except, of course, that the wholesalers paid the brewers more for beer than they would have paid in the absence of the injunction, assuming the law was valid. All of this is long past; the law was repealed after a few years and ultimately held *not* valid, and so it turned out that the wholesalers paid a permissible price for their beer, even though they still complain that the price charged by the brewers in the 1979–85 timeframe was in some way unfair.

None of this is reviewed or analyzed by the majority in any way. Instead, the opinion offers the wholly speculative possibilities (1) that the wholesalers who decided to settle rather than litigate would somehow be treated unjustly if Stroh's position that the 1979 law was invalid were now upheld by this Court, and (2) that the state might

somehow be liable to the settling wholesalers if, notwithstanding the fact that the 1979 law is now clearly invalid, Stroh were exonerated from liability on its bond.

I reject as entirely unfounded the notion that the state could incur any liability whatsoever to the brewers who settled their potential liability under the preliminary injunction bonds by paying money to the state in exchange for a release from any further liability and in order to avoid the expenses, hazards, and inconveniences of continued litigation. The *McKesson* case [16] does not even come close to suggesting that such a settlement (especially where, as here, the state has no authority under the statute to collect any money from the settling parties in the first place) might give rise to liability on the part of the state or otherwise result in inequitable consequences to other parties. As for those other parties, I regard it as highly dubious to suggest that parties who voluntarily settled litigation to get a contingent liability off their books (and for whatever other reasons they may have settled) would somehow be treated unfairly if we recognized that the party who persisted in its constitutional challenge and who ultimately was vindicated was not liable for the penal sum in its bond.

## V.

In the words of both *Moya* and *Reese*, the majority has reached a result that is "manifestly unjust." It has done so by declaring that a statute, the 1979 law—which the majority itself says has clearly been "finally invalidated" by an intervening decision of the United States Supreme Court—is and was valid because we previously ruled it so, even though "[t]here is no question but that [our prior ruling] is now 'bad law.'" By so holding, the majority not only misapplies the law of the case doctrine; it does so in a way that contravenes supervening federal law and thus violates the Supremacy Clause of the Constitution. *See Henry v. City of Rock Hill,*

16. *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990).

376 U.S. 776, 84 S.Ct. 1042, 12 L.Ed.2d 79 (1964); *Cooper v. Aaron*, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *State v. Lewis*, 543 N.E.2d 1116 (Ind.1989); *Brunner Enters. v. Department of Revenue*, 452 So.2d 550 (Fla.1984); *Townsend v. Clover Bottom Hosp. & School*, 560 S.W.2d 623 (Tenn.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2854, 56 L.Ed.2d 790 (1978).

The majority compounds this error by determining incorrectly a question of federal law: whether the Supreme Court's decision in *Healy II* should be limited to prospective-only effect and not applied in the circumstances of this case. While not a violation of the Supremacy Clause, this is simply an erroneous ruling on an issue of federal law which does a grave injustice to the losing party before us and confers an unwarranted windfall on the parties who have prevailed.

I therefore dissent.

RANSOM, J., concurs.