881 P.2d 1376

Johanna BEAVERS, Plaintiff–Petitioner,

v.

JOHNSON CONTROLS WORLD SER-
VICES, INC., and Arthur Dasilva,
Defendants–Respondents.

No. 21462.

Supreme Court of New Mexico.

Sept. 2, 1994.

Eaton, Martinez & Hart, Roger V. Eaton, Michael B. Browde, Albuquerque, for petitioner.

Baca, Coryell, Gershon & Hall, P.A., Bradford V. Coryell, Santa Fe, for respondents.

Rodey, Dickason, Sloan, Akin & Robb, P.A., James P. Bieg, Santa Fe, for amicus curiae N.M. Def. Lawyers.

## OPINION

MONTGOMERY, Chief Justice.

This case involves one of the great jurisprudential debates of the twentieth century:[1] Whether an appellate court decision announcing a new rule of law, or changing an old one, should always be applied retroactively or may sometimes be applied only prospectively. We granted certiorari to revisit this question in light of the United States Supreme Court's abandonment last year, in *Harper v. Virginia Department of Taxation,* — U.S. ——, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), of the multi-factored analysis, for civil cases, in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

More specifically, and with reference to the issues in this case, we granted certiorari to consider whether our recognition in *Schmitz v. Smentowski,* 109 N.M. 386, 785 P.2d 726 (1990), of a cause of action for prima facie tort should be applied retroactively to conduct occurring before we decided *Schmitz.* In the opinion here under review, our Court of Appeals held that *Schmitz* should not be applied retroactively but only prospectively to conduct occurring after our recognition of the prima facie tort doctrine. *Beavers v. Johnson Controls World Services, Inc.,* 116 N.M. 29, 32, 859 P.2d 497, 500 (Ct.App.), *cert. granted,* 115 N.M. 795, 858 P.2d 1274 (1993). Petitioner Beavers ("Plaintiff") contends that we should follow the Supreme Court's lead in *Harper* and

---

1. *Compare, e.g.,* Walter V. Schaefer, *The Control of "Sunbursts": Techniques of Prospective Overruling,* 42 N.Y.U.L.Rev. 631 (1967) (at 634: "Justice Cardozo's writings established the legitimacy of the technique of prospective overruling. That technique has been employed by many courts in this country, and in recent years by the Supreme Court of the United States as well.") *with, e.g.,* Paul J. Mishkin, *Foreword: The High Court, the Great Writ, and the Due Process of Time and Law,* 79 Harv.L.Rev. 56 (1965) (at 65–66 & 70: "Prospective lawmaking ... smacks of the legislative process; for it is ordinarily taken for granted ... that judicial decisions operate with inevitable retroactive effect.... Ineluctable retroactivity ... [would] operate as an 'inherent restraint' on judicial lawmaking ... [and] compel the Court to confront in sharpest form the possible undesirable consequences of adopting a new rule[.]").

jettison the *Chevron Oil* approach, thereby adopting a bright-line rule of retroactivity in all civil cases. Alternatively, Plaintiff contends that we should reject the Court of Appeals' application of *Chevron Oil* and hold that *Chevron Oil,* correctly applied, requires that *Schmitz* be deemed fully retroactive.

*Harper* holds that a new rule of *federal* law announced by the Supreme Court "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate announcement of the rule." —— U.S. at ——, 113 S.Ct. at 2517. *Chevron Oil* employed a more flexible approach, requiring consideration of several factors in deciding whether to apply a new rule retroactively to events occurring before the rule's announcement or only prospectively to events postdating that announcement. We adopted the *Chevron Oil* approach in *Whenry v. Whenry,* 98 N.M. 737, 739, 652 P.2d 1188, 1190 (1982).

We agree with Respondents, Johnson Controls World Services, Inc., and Arthur DaSilva ("Defendants"), that we should decline Plaintiff's invitation to follow *Harper* as a matter of our *state* law regarding the retroactivity versus prospectivity of a judicial decision in a civil case. We agree with Plaintiff, however, that the Court of Appeals incorrectly applied the *Chevron Oil* approach in declaring that the prima facie tort rule announced in *Schmitz* was nonretroactive to conduct occurring, and harm suffered, before *Schmitz* was decided. Accordingly, we reverse the Court of Appeals' decision and remand to that Court for consideration of other issues in Defendants' appeal.

## I.

The Court of Appeals reversed a judgment of the District Court of Rio Arriba County, entered on a jury verdict, in Plaintiff's favor for $76,000. The district court submitted the case to the jury based solely upon Plaintiff's claim of prima facie tort, and the jury returned a special verdict finding that Plaintiff had proven the elements of the tort and that she had suffered damage as a proximate result of DaSilva's conduct. At trial, Plaintiff adduced evidence of the following facts to support her claim.[2]

Johnson Controls provides support services to the Los Alamos National Laboratory at Los Alamos, New Mexico, under a contract with the Laboratory. Before 1986 the services were provided by Johnson Controls' predecessor, The Zia Company, for whom Plaintiff had worked in various secretarial positions since 1978. She continued her employment when Johnson Controls acquired the contract in mid–1986, and she became DaSilva's secretary in January 1987, occupying a position classified as Secretary III.

In October 1987 the photocopy machine near Plaintiff's office broke down. When she attempted to fix it, DaSilva, who assumed the machine was covered by a service contract, told her to call a repairman. She did, and the machine was fixed. However, it was not covered by a service contract, so the repairman sent a bill for his services. Plaintiff put the bill on DaSilva's desk, whereupon he became angry and told her she had not followed the correct procedure: She should have submitted a request for service to the company's purchasing department.

Plaintiff and DaSilva discussed the copier incident a number of times. DaSilva told her he was thinking about writing a memorandum to employees regarding the error; Plaintiff requested that he not do so because she felt she had been following his orders. DaSilva nonetheless directed his assistant to

---

**2.** In reciting the facts underlying Plaintiff's claim, we intimate no view as to the sufficiency of the evidence to establish the prima facie tort elements of intent to harm and lack of justification. As noted later in this opinion, that issue—sufficiency of the evidence—was one of the issues raised by Defendants in their appeal to the Court of Appeals; the Court did not resolve it, and it is not before us now. Similarly, nothing in the following recitation, or anywhere else in this opinion, is intended to intimate any view as to the merits of Defendants' other issues on appeal to the Court of Appeals—all of which, except the retroactivity issue, were not decided by the Court. *See* 116 N.M. at 30, 859 P.2d at 498.

draft a memo mentioning the incident and outlining the correct procedure for purchase orders. Plaintiff was instructed to type three drafts of the memo, which was entitled "Not Following Procedures." The memo began by relating that an employee in DaSilva's department had recently made a direct order of services from an outside vendor in violation of company procedures. Plaintiff thought it was clear to everyone in the department that she was the employee discussed in the memo and felt that it subjected her to ridicule. The process of having to type various drafts of a memo that humiliated her was so upsetting that she requested a transfer; however, because there were no Secretary III positions available elsewhere in the company she continued working for DaSilva.

In mid-November Plaintiff submitted a leave slip to DaSilva, seeking to take leave on Monday and Tuesday of Thanksgiving week (she previously had received permission to take leave on Wednesday) to visit relatives in another state. DaSilva indicated approval but did not sign the slip. Concerned about the unsigned leave slip, Plaintiff requested her husband to inquire whether DaSilva had signed it; DaSilva responded to her husband's inquiry by simply shrugging and walking away without saying anything. Not knowing whether the slip had been signed, Plaintiff delayed her trip. She reported for work on Monday and found that although the leave slip had remained unsigned, DaSilva had made substitute secretarial arrangements and expressed surprise when she appeared for work. This so distressed her that she went to the company's health facility and was diagnosed by a physician's assistant as experiencing symptoms of stress.

On December 3 Plaintiff and DaSilva had a meeting in DaSilva's office to discuss their difficulties. The meeting quickly turned into a heated exchange of criticism, culminating in DaSilva's assuring Plaintiff that she would be transferred out of his department by the end of the week. Plaintiff left the meeting very upset. On December 7 she left work never to return; she was diagnosed on that day by a chiropractor as having a stress-related illness. In January of the following year, after arguments and fights with family members, she checked herself into a mental health facility and remained hospitalized for about a week.

On January 6, 1988, Plaintiff filed a complaint against Johnson Controls with the New Mexico Human Rights Commission, alleging essentially the same facts as formed the basis for her present tort action. She subsequently withdrew the complaint and in December of that year filed a claim against Johnson Controls and its insurance carrier with the Workers' Compensation Division of the Department of Labor. She alleged that she had suffered psychological injuries as a result of a workplace accident compensable as a "primary mental impairment" under the Workers' Compensation Act. After a trial the Workers' Compensation Judge found that the events at issue constituted an accidental injury occurring in the course and scope of her employment, but ruled that she had failed to prove a "traumatic event" under the applicable section of the act. She appealed to the Court of Appeals, but subsequently withdrew her appeal in light of a New Mexico appellate decision that defined "traumatic event" for purposes of the applicable section.

■ Then, on October 5, 1990, Plaintiff filed the present district-court action, seeking damages for prima facie tort, the tort of "outrage," and the tort of intentional infliction of emotional distress.[3] The court dismissed the latter two claims on summary judgment, ruling that Plaintiff had failed as a matter of law to assert such severe conduct as would support these claims, and the case proceeded to trial in June 1991 on the prima facie tort claim. The court instructed the jury that to establish her claim Plaintiff had the burden of proving that Defendants per-

---

**3.** The tort of "outrage," if there is such a tort, is the same as the tort of intentional infliction of emotional distress based on extreme and outra- geous conduct. *See Phifer v. Herbert,* 115 N.M. 135, 139, 848 P.2d 5, 9 (Ct.App.1993).

formed one or more intentional, lawful acts; that Defendants intended that the act or acts would cause harm to Plaintiff or knew with certainty that harm would necessarily result; that the acts did in fact proximately cause harm; and that Defendants' conduct was not justifiable under the circumstances. The jury returned a special verdict finding that DaSilva committed acts intended to cause harm to Plaintiff or which he knew with certainty would cause such harm, that the acts proximately caused Plaintiff to suffer damage, that the acts were not justified, and that Plaintiff's damages amounted to $76,000.

After the trial court entered its judgment on the verdict, Defendants appealed to the Court of Appeals, asserting several grounds for reversal. Defendants contended that the exclusive-remedy provisions of the Workers' Compensation Act barred the action, that the trial court had erred in applying the standard for determining whether the prima facie tort claim could go to the jury, that the verdict was not supported by sufficient evidence of intent to harm and lack of justification, that Plaintiff's exclusive remedy was under the Human Rights Act, and that other established legal theories precluded relief under prima facie tort. And, as their first contention, they claimed that the prima facie tort theory did not "apply retroactively to conduct that took place before the cause of action even existed." The Court of Appeals decided only this first issue, holding that "prima facie tort [does not apply] retroactively to conduct that took place before that cause of action was recognized." 116 N.M. at 30, 859 P.2d at 498. Plaintiff then filed, and we granted, her petition for a writ of certiorari to review this holding.

## II.

As Justice Cardozo observed more than a half century ago in *Great Northern Railway*

*Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 365, 53 S.Ct. 145, 149, 77 L.Ed. 360 (1932), "[t]he choice for any state [between retroactivity and prospectivity of a judicial decision] may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature." In *Harper*, the juristic philosophy and conception of the nature of law of at least the separately concurring member of the five-justice majority[4] that overruled *Chevron Oil* were (again) revealed. Quoting from *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60, 73 (1803), Justice Scalia reminded us that it is the duty of courts " 'to say what the law *is* ' " and added "—not what the law *shall be.*" —— U.S. at ——, 113 S.Ct. at 2523 (Scalia, J., concurring; emphasis his). *See also James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 549, 111 S.Ct. 2439, 2451, 115 L.Ed.2d 481 (1991) (Scalia, J., concurring in judgment) (stating that power of federal judiciary is limited to "power 'to say what the law is,' [citing *Marbury* ] not the power to change it"). Justice Scalia further illuminated his views in *Harper* by quoting Blackstone: Retroactivity derives from the judicial power

> "not delegated to pronounce a new law, but to maintain and expound the old one[;]" ... a judge overruling [a] decision would "not pretend to make a new law, but to vindicate the old one from misrepresentation. For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was *bad law,* but that it was *not law.*"

*Harper,* —— U.S. at ——, 113 S.Ct. at 2523 (Scalia, J., concurring; emphasis in original; citations omitted) (quoting 1 William Blackstone, *Commentaries* 69–70 (1765)).

It thus appears that Justice Scalia holds (or pretends to hold[5]) a conception of the

---

4. Justice Thomas authored the majority opinion, in which Justices Blackmun, Stevens, Scalia, and Souter concurred, *Harper,* —— U.S. at ——, 113 S.Ct. at 2513–20. Justice Scalia filed a separate concurring opinion, *id.* at ——–——, 113 S.Ct. at 2520–24. Justices Kennedy and White concurred in the judgment but disagreed

with the majority's renunciation of *Chevron Oil,* *id.* at ——–——, 113 S.Ct. at 2524–26. Justice O'Connor and Chief Justice Rehnquist dissented, *id.* at ——–——, 113 S.Ct. at 2526–39.

5. Justice Scalia apparently does not *really* believe that the law is something courts search for, and

nature of law as something fixed and nearly immutable, to be discovered and, when correctly perceived, vindicated in declaring the true version or correcting an old misapprehension.[6] This view contrasts sharply with that of Justice O'Connor, who dissented in both *Beam* and *Harper*. In the latter case, she summarized her position by quoting from her dissent in the former:

> "[W]hen the Court changes its mind, the law changes with it. If the Court decides, in the context of a civil case or controversy, to change the law, it must make [a] determination whether the new law or the old is to apply to conduct occurring before the law-changing decision. *Chevron Oil* describes our long-established procedure for making this inquiry."

*Harper*, ⸺ U.S. at ⸺, 113 S.Ct. at 2527 (quoting *Beam*, 501 U.S. at 550, 111 S.Ct. at 2451 (O'Connor, J., dissenting)). She enlisted the support of an ally no less formidable than Justice Felix Frankfurter, who had said more than thirty-five years before:

> "We should not indulge in the fiction that the law now announced has always been the law.... It is much more conducive to law's self-respect to recognize candidly the considerations that give prospective content to a new pronouncement of law."

*Id.* at ⸺, 113 S.Ct. at 2528 (quoting *Griffin v. Illinois*, 351 U.S. 12, 26, 76 S.Ct. 585, 594, 100 L.Ed. 891 (1956) (opinion concurring in judgment)).

■ We think that the jurisprudence of this state, as indicated in the discussion that follows, is more nearly consistent with the views of the *Harper* minority that voted to retain *Chevron Oil* than with those of the majority that decided to cast it aside.

In any event, whatever their "juristic philosophy," the other four members of the five-member majority that discarded *Chevron Oil* in *Harper* did so on two grounds:

> First ... that "the nature of judicial review" strips us of the quintessentially "legislat[ive]" prerogative to make rules of law retroactive or prospective as we see fit. Second ... that "selective application of new rules violates the principle of treating similarly situated [parties] the same."

*Harper*, ⸺ U.S. at ⸺, 113 S.Ct. at 2516 (quoting *Griffith v. Kentucky*, 479 U.S. 314, 322–23, 107 S.Ct. 708, 713, 93 L.Ed.2d 649 (1987)).

■ Although the United States Supreme Court has thus held that it lacks the power to choose between retroactivity and prospectivity in civil cases, this Court has never regarded itself as so limited, and we are not inclined to do so now. Indeed, in *Lopez v. Maez*, 98 N.M. 625, 632, 651 P.2d 1269, 1276 (1982), we expressly held: "It is within the inherent power of a state's highest court to give a decision prospective or retrospective application without offending constitutional principles." The Supreme Court established this proposition as a matter of fed-

discover, as if it were so much buried treasure. Rather, he seems to urge that courts should behave in this way so as to maximize restraint on what some might call judicial legislation and minimize temptation to stray from what he conceives to be the proper judicial role—applying settled law to conduct that has already occurred by the time of a lawsuit. He says: "I am not so naive ... as to be unaware that judges in a real sense 'make' law. But they make it *as judges make it*, which is to say *as though* they were 'finding' it—discerning what the law *is*, rather than decreeing what it is today *changed to*, or what it will *tomorrow* be." *Beam*, 501 U.S. at 549, 111 S.Ct. at 2451. He takes this view because he believes it necessary to avoid "alter[ing] in a fundamental way the assigned bal-

ance of responsibility and power among the three branches." *Id.*

6. Two of the undersigned participants in this opinion have previously gone on record as opposed to this reified conception of law. *See Stroh Brewery Co. v. Director of N.M. Dep't of Alcoholic Beverage Control*, 112 N.M. 468, 477, 816 P.2d 1090, 1099 (1991) (Montgomery & Ransom, JJ., dissenting) ("The law is not a 'brooding omnipresence in the sky,' nor is it something chiseled into stone tablets somewhere." (quoting *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting))), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 1166, 117 L.Ed.2d 413 (1992).

eral constitutional law in *Great Northern Railway,* 287 U.S. at 364, 53 S.Ct. at 148, and no party to this appeal contends that our state constitution requires a different rule. We have repeatedly held that certain decisions would be given "selective" or "modified" prospective effect,[7] *see, e.g., Montano v. Gabaldon,* 108 N.M. 94, 96, 766 P.2d 1328, 1330 (1989) (interpretation of term "indebtedness" in N.M. Const. art. IX, § 10); *Boudar v. E.G. & G., Inc.,* 106 N.M. 279, 280–81, 742 P.2d 491, 492–93 (1987) (modification of "at will" employment rule); *Scott v. Rizzo,* 96 N.M. 682, 690, 634 P.2d 1234, 1242 (1981) (adoption of comparative negligence); *Navajo Freight Lines, Inc. v. Baldonado,* 90 N.M. 264, 265–66, 562 P.2d 497, 498–99 (1977) (invalidation of guest statute on constitutional grounds); and our conception of the judicial power under Article VI of our constitution does not lead us to conclude that these decisions were wrong. We therefore decline to follow the Supreme Court's lead in holding that we lack the power to apply a new rule prospectively—whether the rule is derived from overruling a past precedent or fashioning a new precedent—even though (as in this case) the decision announcing the new rule has already been applied retroactively to the conduct of the litigants in the case in which the rule was announced.

Although we thus disagree with the Supreme Court's first reason in *Harper* for adopting a rule of universal retroactivity in civil cases—constitutional powerlessness to apply a new rule prospectively—we find the second reason quite compelling. That reason, again, is the desirability of treating similarly situated parties alike. *See* Francis X. Beytagh, *Ten Years of Non–Retroactivity: A Critique and Proposal,* 61 Va.L.Rev. 1557, 1624 (1975) (discussing "the single most significant difficulty presently posed by [nonretroactivity]—unequal treatment of those similarly situated resulting solely from the sheer happenstance of the judicial calendar"). It was this reason, primarily, that led the Court to adopt a rule of universal retroactivity in criminal cases in *Griffith v. Kentucky,* 479 U.S. at 322–23, 107 S.Ct. at 713.

■ As with the first reason, we do not find the second reason so powerful that it requires a rule of blanket retroactivity in all civil cases. Sometimes the other *Chevron Oil* factors—particularly the factor or subfactor of the parties' or others' reliance on the old rule—will argue so strongly for nonretroactivity that the factor (if it *is* a factor, rather than a constitutional imperative [8]) of similar treatment of similarly situated parties will simply be outweighed. However, we are persuaded that the strength of the similar-treatment factor justifies at least a presumption in favor of retroactivity in civil cases.

Just as there is a presumption that a legislative enactment will operate prospectively

---

**7.** Modified or selective prospectivity is the applicability of a decision to the parties in the case in which the decision is announced, whose conduct obviously occurred before announcement of the decision, but thereafter only to parties whose conduct occurs after the announcement. Because *Schmitz* applied the prima facie tort rule to conduct antedating the decision in that case, the Court of Appeals' holding in the present case is an instance of applying a new rule with selective prospectivity.

To be contrasted with selective prospectivity are both "pure" prospectivity and retroactivity. Pure prospectivity obtains when a court applies its new rule only to conduct occurring after the rule's announcement, so that the rule does not even apply to the litigants before the court announcing the decision. Pure prospectivity is rare; a notable example in New Mexico is *Hicks v. State,* 88 N.M. 588, 544 P.2d 1153 (1975), *order and opinion on rehearing,* 88 N.M. 593, 544 P.2d 1158 (1976) (abolishing sovereign immunity but only with respect to cases arising in future). Retroactivity, on the other hand, occurs when a decision applies not only to acts occurring after announcement of the decision and to the litigants before the court, but also to acts occurring before the announcement. *See generally Maxwell v. Ross Hyden Motors, Inc.,* 104 N.M. 470, 471, 722 P.2d 1192, 1193 (Ct.App.1986).

**8.** Plaintiff does not contend that the Equal Protection Clauses of our state and federal constitutions forbid application of the principle of selective prospectivity in this case (or in other cases where we might deem application of the principle otherwise appropriate). The possibility that selective prospectivity might deprive parties in a subsequent case of equal protection of the laws raises an interesting question, but since the question is not presented here we have not researched it and do not address it.

only in the absence of clear indication of legislative intent to the contrary, *see, e.g., Southwest Distrib. Co. v. Olympia Brewing Co.,* 90 N.M. 502, 508, 565 P.2d 1019, 1025 (1977), so we believe there should be a presumption that a new rule adopted by a judicial decision in a civil case will operate retroactively. *See Harper,* —— U.S. at ——, 113 S.Ct. at 2517 (referring to "presumptively retroactive effect" of decisions in civil cases); *Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984) (stating that, as a rule, judicial decisions apply retroactively and that a legal system based on precedent has a built-in presumption of retroactivity); *see also* Mishkin, *supra* note 1, at 60, 62 (suggesting that courts' role to decide disputes after they have arisen "requires that judicial decisions operate (*at least ordinarily* ) with retroactive effect" and that, if prospective application of a judicially created rule is to be allowed, such application should "be reserved for actual use only *in special circumstances* " (emphasis added; footnote omitted)).

■ Because of the compelling force of the desirability of treating similarly situated parties alike, we adopt a presumption of retroactivity for a new rule imposed by a judicial decision in a civil case, in lieu of the hard-and-fast rule prescribed for federal cases in *Harper.* As with the converse presumption of prospectivity in the legislative arena, the retroactivity presumption for judicial decisions can be overcome by an express declaration, in the case announcing the new rule, that the rule is intended to operate with modified or selective (or even, perhaps, pure) prospectivity. *See, e.g., Lopez,* 98 N.M. at 632, 651 P.2d at 1276 (applying decision to parties in case "for having afforded us the opportunity to change an outmoded and unjust rule of law" and to parties in future cases "in which the damages and injuries arise after the date of the mandate in this case"). Absent such a declaration, the presumption may be overcome by a sufficiently weighty combination of one or more of the *Chevron Oil* factors, which we espoused in *Whenry* and which, by today's decision, we continue to favor. To determine whether one or more of the *Chevron Oil* factors dispels the presumption of retroactivity in this case requires an analysis of those factors—to which we now turn.

### III.

■ In *Whenry,* 98 N.M. at 739, 652 P.2d at 1190, we quoted the "retroactivity guidelines" articulated in *Chevron Oil,* 404 U.S. at 106–07, 92 S.Ct. at 355, as follows:

> *First,* the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.

> *Second,* it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation."

> *Finally,* we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."

> [Emphasis and spacing added; citations omitted.]

The Court of Appeals applied these three guidelines or factors, 116 N.M. at 31–32, 859 P.2d at 499–500; but, although we agree with part—not all—of its analysis, we disagree with its evaluation of the applicability and strength of the relevant factors. We are left with the conclusion that the outcome of the Court of Appeals' analysis is not sufficient to rebut the presumption of retroactivity attaching to a judicially announced rule.

### A.

In its consideration of the first factor, the Court of Appeals concluded that *Schmitz* de-

cided an issue of first impression the resolution of which was not clearly foreshadowed. *Id.* at 31, 859 P.2d at 499. The Court acknowledged our statement in *Schmitz*, 109 N.M. at 394, 785 P.2d at 734, that "[p]rima facie tort is not a recent innovation;" but it placed considerable emphasis on the fact that "only two states" had recognized the tort as a cause of action at the time *Schmitz* was decided. 116 N.M. at 31, 859 P.2d at 499. The Court did not comment on our considerable reliance on the *Restatement*'s recognition of the tort in Restatement (Second) of Torts § 870 (1977). *See Schmitz*, 109 N.M. at 394–95, 785 P.2d at 734–35. As the Court did say, our recognition of the tort in *Schmitz* was consistent with this state's imposition of liability for other intentional conduct resulting in harm. 116 N.M. at 31, 859 P.2d at 499.

Nevertheless, we are in general agreement with the Court of Appeals and Defendants that part of the first *Chevron Oil* factor cuts in Defendants' favor: *Schmitz* did establish a new principle of law whose adoption was not *clearly* foreshadowed by previous decisions in this or other jurisdictions. That, however, does not end our evaluation of the first factor. There remains for consideration the subfactor of reliance—a factor that is so important in retroactivity analysis that we think it deserves recognition almost independent from the recognition given to the element of "newness" in the first factor. (As discussed below, we also think that considerations of reliance figure importantly in evaluating the third *Chevron Oil* factor.)

The extent to which the parties in a lawsuit, or others, may have relied on the state of the law before a law-changing decision has been issued can hardly be overemphasized. It is a factor that receives repeated recognition in cases discussing retroactivity vs. prospectivity. *See, e.g., Hicks v. State*, 88 N.M. at 594, 544 P.2d at 1159 (pure prospectivity accorded to decision abolishing sovereign immunity because governmental entities had conducted their affairs in reliance upon prior state of law); *Lopez v. Maez*, 98 N.M. at 632, 651 P.2d at 1276 (selective prospectivity applied to decision imposing liability on tavernkeeper selling liquor to intoxicated person because tavernkeepers might not have acquired necessary insurance); *Whenry v. Whenry*, 98 N.M. at 739, 652 P.2d at 1190 (rule announced in case overruling previous cases holding military retirement pay to be community property held not retroactive because attorneys and courts had relied on previous rule).

The reliance interest to be protected by a holding of nonretroactivity is strongest in commercial settings, in which rules of contract and property law may underlie the negotiations between or among parties to a transaction. *See Payne v. Tennessee*, 501 U.S. 808, 828, 111 S.Ct. 2597, 2610, 115 L.Ed.2d 720 (1991) ("Considerations in favor of *stare decisis* are at their acme in cases involving property and contract rights, where reliance interests are involved[.]"); *see also Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2809, 120 L.Ed.2d 674 (1992) ("[T]he classic case for weighing reliance heavily in favor of following the earlier rule occurs in the commercial context[.]"). Upsetting what may very well be the legitimate expectations of one or more of the parties under the rubric of "treating similarly situated parties the same" may simply be unjustified.

A similar concern for the reliance interests of state and local governments imposing taxes motivated the plurality's opinion in *American Trucking Ass'ns v. Smith*, 496 U.S. 167, 182–83, 110 S.Ct. 2323, 2333, 110 L.Ed.2d 148 (1990) (holding that previous decision invalidating highway use equalization tax should not be applied retroactively because of "inequity of unsettling actions taken in reliance on [overruled] precedents").

In the tort context, however, a party's reliance interest is seldom as strong as it is in the commercial context. *Stare decisis* considerations are at their zenith in contract- and property-law settings; they lack that force in the area of tortious wrongs against others. We say this because the purposes of tort law do not give rise, generally, to reli-

ance-based conduct. Those purposes are compensation of the victim and deterrence of the tortfeasor. *See Folz v. State,* 110 N.M. 457, 467, 797 P.2d 246, 256 (1990) ("Under our fault system, there is a policy of deterrence associated with responsibility for compensatory damages."); *see also id.* at 472, 797 P.2d at 261 (Montgomery, J., specially concurring) ("[O]ur tort law has the dual objectives of compensating victims and deterring negligence." (citing, inter alia, Restatement (Second) of Torts § 901 (1977))). With respect to the first of these purposes, it is doubtful that a tort victim ever relies on the availability of compensation before planning his or her activity. With respect to the second purpose, a potential tortfeasor may or may not rely on the likelihood *vel non* of liability in undertaking to act in certain ways. Obtaining insurance is one way in which a potential tort defendant may (or may not) regulate his or her conduct; other examples of deciding whether and how to act in various circumstances based on the probability that liability may or may not result come fairly easily to mind.

In the specific context of prima facie tort, it is hard to imagine that a potential defendant plans his or her conduct with rules of liability or nonliability in mind. After all, "[t]o constitute a prima facie tort, the tortfeasor must act maliciously, with the intent to cause injury, and without justification or with insufficient justification." *Schmitz,* 109 N.M. at 395, 785 P.2d at 735. The jury was so instructed in the present case. As noted above, the jury found that DaSilva committed intentional acts intended to cause harm to Plaintiff (or knew with certainty that his acts would necessarily cause such harm). It is difficult to understand how Defendants can argue, as they do, that DaSilva in effect "relied" on a claimed absence of potential liability for such conduct.

Related to this point is Defendants' argument, vigorously pressed here and in the Court of Appeals, that, as the Court of Ap-

peals phrased it in accepting the argument, "recognition of prima facie tort as a cause of action 'imposes significant new duties and conditions and takes away previously existing rights.'" 116 N.M. at 31, 859 P.2d at 499 (quoting *Lopez v. Maez,* 98 N.M. at 632, 651 P.2d at 1276). Although we did formulate this criterion of prospectivity in *Lopez*—i.e., that a rule which imposes significant new duties and takes away previously existing rights should not be applied retroactively— we now recognize it as somewhat question-begging. To say that, before *Schmitz,* DaSilva had the *right* to injure Plaintiff through malicious and intentional conduct, which right was "taken away" by *Schmitz,* and that *Schmitz* imposed the significant new duty of refraining from such conduct, is to begin the retroactivity inquiry with the answer to the very question at issue. If DaSilva had the right to engage in this conduct, then *Schmitz* is not retroactive. We think the inquiry requires a more searching analysis, and we believe that *Chevron Oil* affords as good a framework for that kind of analysis as any other.

We conclude that the perpetrator of a prima facie tort, at least in general, does not rely on the state of the law in deciding whether to engage in the conduct proscribed by the tort. We further conclude that although *Schmitz* announced a new principle of law which was not clearly foreshadowed by preexisting law, the presumption of retroactivity associated with a judicial decision is not overcome by the first *Chevron Oil* factor.

**B.**

We deal more briefly with the second and third *Chevron Oil* factors. The Court of Appeals held that the second factor—whether retrospective operation will further or retard operation of the prima facie tort rule— weighed in favor of nonretroactivity by focusing, properly, on the purposes of the prima facie tort action.[9] 116 N.M. at 31–32, 859 P.2d at 499–500. The Court said that the

---

**9.** The Court of Appeals reversed the order of the second and third *Chevron Oil* factors, based on

its treatment of the test in *Kennecott Copper Corp. v. Chavez,* 109 N.M. 439, 442, 786 P.2d 53, 56

action has three broad purposes: compensation, punishment, and deterrence. Since we have already agreed in this opinion with the first and third of these purposes (and although we are inclined to doubt that punishment is a valid purpose, unless punitive damages are sought), we believe that the Court identified the applicable purposes; but we disagree with the Court's assessment of the extent to which retrospective operation of the prima facie tort rule would further its effect. The Court acknowledged that the goal of compensation might be advanced by retroactive application, but held that the goal of deterrence would not. *Id.* at 32, 859 P.2d at 500.

We find no fault with this analysis, except that we think it inappropriately subordinates the goal of compensation to that of deterrence. The *sine qua non* of prima facie tort lies in the tortfeasor's intent to injure the victim, coupled with actual injury. *See Schmitz,* 109 N.M. at 394, 785 P.2d at 734 (defining intent to injure and injury as two of four elements of tort). It is clear that the goal of compensation would be furthered by retrospective operation of the rule, even though the goal of deterrence would not. Thus, the impact of the second *Chevron Oil* factor is at best neutral.

Before leaving the second factor, we pause to take note of a theme that appears to underlie some of the Court of Appeals' approach to, and much of Defendants' and the Amicus Defense Lawyers Association's arguments on, the issue in this case. As already noted, Defendants and the Court of Appeals stress the point that prima facie tort has been adopted by "only two" jurisdictions. The Defense Lawyers Association elaborates on this point, saying "[e]ven those few jurisdictions that had recognized this tort did so reluctantly" and "[t]he prima facie tort concept is inconsistent with the general common law and is directly contrary to New Mexico precedent." It is probably not unfair, then, to surmise that Defendants' and Amicus's—

and perhaps also the Court of Appeals'—view of the retroactivity issue in this case is colored by a generally hostile attitude toward the prima facie tort doctrine. And it may turn out that further experience with the doctrine will lead us to the same conclusion as was expressed, in dictum, a few years ago by an appellate court in one of the two jurisdictions that have adopted prima facie tort: "[W]e are profoundly dissatisfied with the concept of 'prima facie tort' because we regard it as unworkable[.]" *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 556 (Mo.Ct.App.1983).

But uneasiness or even dissatisfaction with a rule of law is not a reason for holding that the rule shall apply only prospectively. We must take the rule as we find it, articulated and justified in a thoroughly reasoned opinion of this state's highest court, and determine whether the rule should apply to conduct predating announcement of the rule, based on the analysis reviewed here and not on one's pleasure or displeasure over the rule itself.

We need not dwell on the third *Chevron Oil* factor—the inequity imposed by retroactive application. The Court of Appeals thought that this factor pointed toward nonretroactivity because the prima facie tort rule "punishes conduct that was lawful in New Mexico until *Schmitz* was decided." 116 N.M. at 31, 859 P.2d at 499. Once again, we have difficulty with the circular argument that the rule is not retroactive because prerule conduct was lawful—i.e., because the rule is not retroactive. Beyond that, and attempting to scrutinize more closely the alleged inequity attending retroactive application, we think that at least one of the powerful considerations informing the inequity factor is, as already mentioned, the degree of reliance that persons affected, or potentially affected, by the rule may have placed on the state of the law antedating the rule. The greater the extent a potential defendant can

(Ct.App.1990). The order in which the factors are evaluated, of course, is immaterial to the

outcome of the analysis.

be said to have relied on the law as it stood at the time he or she acted, the more inequitable it would be to apply the new rule retroactively. Defendants make this point forcefully, arguing that "[o]ne of the cherished, fundamental principles of this nation's jurisprudence is that persons are at least entitled to know in advance what consequences adhere to their actions."

Yet, despite the force of Defendants' argument, we think it rings hollow in the context of this case and in the context of the prima facie tort rule generally. We have already reviewed how the rule affords compensation to a person harmed through the malicious, intentional conduct of an actor who intends to inflict such harm, and we have expressed our misgivings over the notion that such an actor could have relied on the claimed proposition that he could engage in such conduct with impunity. For this reason, we conclude that retroactive application of the rule announced in *Schmitz* does not produce substantial inequitable results.

Additionally, we point out that the third *Chevron Oil* factor (the inequity imposed by retroactive application) embraces, or should embrace, not only the inequity imposed on a litigant in the lawsuit in which the retroactivity question is considered, but also the potential unfairness to *other* claimants who have been victimized by conduct occurring before the law-changing decision but who for one reason or another have not asserted their claims until after announcement of the new rule. This, of course, is the same consideration that has prompted us to adopt the presumption of retroactivity referred to throughout this opinion: the desirability of treating similarly situated parties alike. We have thus come full circle, and we find in the third *Chevron Oil* factor reinforcement of our holding that a presumption of retroactivity is associated with a new judicial decision.

Summarizing, the first and second *Chevron Oil* factors are somewhat inconclusive, although the absence of justifiable reliance (first factor) and furtherance of the compen-

satory purpose of the prima facie tort rule (second factor) militate in favor of retroactivity. The same consideration of lack of reliance leads to the conclusion that applying the rule retroactively is not inequitable and does not result in injustice or undue hardship. The three factors, therefore, do not, singly or in the aggregate, outweigh the presumption of retroactivity associated with a judicial decision.

The decision of the Court of Appeals is reversed, and the cause is remanded to that Court for consideration of the other issues in Defendants' appeal.

**IT IS SO ORDERED.**

RANSOM and FROST, JJ., concur.