909 P.2d 732

Connie GUTIERREZ, Worker–Appellee,

v.

CITY OF ALBUQUERQUE, Self–Insured, Respondent–Appellant.

No. 15573.

Court of Appeals of New Mexico.

Nov. 6, 1995.

Certiorari Granted Dec. 14, 1995.

Ann M. Conway, Deborah S. Dungan, Padilla, Riley & Shane, P.A., Albuquerque, for respondent-appellant.

Josephine D. Rohr, George W. Weeth, Albuquerque, for worker-appellee.

*OPINION*

PICKARD, Judge.

1. The City of Albuquerque challenges a decision of the workers' compensation judge applying *Montoya v. AKAL Security, Inc.*, 114 N.M. 354, 838 P.2d 971 (1992), to this case although both the work-related accident and the settlement with the third-party tortfeasor occurred before *Montoya* was decided. The City also challenges the judge's decision to apply *Montoya* in such a way that the City is not reimbursed for all compensation benefits it paid to the extent of the settlement with the third-party tortfeasor. As a preliminary matter, however, the City contends that the release Worker signed with the third-party tortfeasor extinguishes the City's liability to Worker under general principles of the law governing construction of releases. We hold that the City did not properly preserve its issue concerning the release; that the judge misconstrued the holding of *Montoya* and that, properly construed, *Montoya* does not permit the equitable allocation of settlement proceeds under the facts of a case

**174**

like this one; but that *Montoya* does operate retroactively to allow Worker to continue to recover compensation benefits notwithstanding her settlement of the third-party tort claim.

## I. *FACTS*

2. Worker was a plumbing inspector for the City. On July 9, 1987, while inspecting a residential construction site, Worker slipped and fell on two pieces of cardboard and injured her back. The cardboard was left on the site by Thermal Control, Inc., a job contractor. The City paid Worker substantial compensation and medical benefits.

3. Due to a dispute over the amount of compensation and other benefits due, on April 13, 1990, Worker filed a workers' compensation claim against the City and soon thereafter a third-party negligence suit against Thermal. On January 10, 1992, Worker settled her claim against Thermal for $140,000 and executed a full release. The settlement may not have been disclosed to the City until shortly after the *Montoya* opinion was filed, in September 1992. The City then asserted a claim to full reimbursement for all compensation benefits paid Worker pursuant to NMSA 1978, Section 52–5–17 (Repl.Pamp.1991) (effective until Jan. 1, 1991). The City contended that Worker was no longer eligible for compensation benefits because she had elected her remedy by settling the lawsuit with Thermal. *See Castro v. Bass*, 74 N.M. 254, 259–60, 392 P.2d 668, 672–73 (1964) (holding that a resolution of third-party action constituted an election of remedies thereby freeing the employer from paying any further benefits under workers' compensation). Worker claimed a right to continuing benefits because, by then, *Castro* had been overruled by *Montoya*.

4. Because *Castro* was still in effect when the accident and settlement occurred, the City moved for summary judgment against Worker's claim for continuing benefits. The judge applied *Montoya* retroactively and denied the motion. The judge then heard evidence on the extent of Worker's damages. As a foundation for calculating the amount of the City's reimbursement, the judge determined that Worker had sustained $24,969.13

in medical expenses, $220,640 ($27,580 × 8 years) in total lost wages (only a portion paid by workers' compensation), and $122,000 in pain and suffering (none paid by workers' compensation), totalling $367,609.13 in actual tort damages. Because Worker had settled her third-party claim for only $140,000, the judge calculated that she had been compensated for only 38% of her total damages. Applying equitable principles, the judge limited the City's reimbursement to that same percentage of its total pay-out. Accordingly, the judge awarded the City reimbursement of 38% of the amounts it had paid and would pay to Worker thereafter for compensation benefits.

## II. *DISCUSSION*
### A. *Third–Party Release*

5. The City initially argues that Worker's claim for future compensation benefits is barred by the "Full Release" incorporated within the settlement agreement between Worker and Thermal. Worker responds that the City failed to preserve this issue for our review on appeal. We agree with Worker.

6. The issue of whether the release would bar Worker's claim was not encompassed in any of the pretrial pleadings; nor was it encompassed in the issues to be decided as they were listed in the pretrial order. The City did not introduce specific evidence on this issue, apart from introducing the release as an exhibit at trial. In this connection, we note that the release was equally relevant to the City's issue under *Castro*. When evidence is relevant to an issue within the pleadings, it will not be the basis for trial by consent for issues not raised. *Schmitz v. Smentowski*, 109 N.M. 386, 390, 785 P.2d 726, 730 (1990). The City did not argue this point at trial or invoke a ruling from the judge on this issue until it filed its requested findings of fact and conclusions of law. Because the issue of whether the release would bar relief against the City is one that raises factual issues concerning the intent of the parties, *see generally Hansen v. Ford Motor Co.*, 120 N.M. 203, 900 P.2d 952 (1995), we believe that the City acted too late in first raising the issue after the trial was over and the evidence closed.

*See* SCRA 1986, 12–216(A) (Cum.Supp.1995) (ruling must be fairly invoked); *see also State v. Trujillo*, 119 N.M. 772, 776, 895 P.2d 672, 676 (Ct.App.) (preservation requires that timely action be taken), *cert. quashed* 120 N.M. 394, 902 P.2d 76 (1995); *Woolwine v. Furr's, Inc.*, 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987) ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court."); *cf. Eldin v. Farmers Alliance Mut. Ins. Co.*, 119 N.M. 370, 376, 890 P.2d 823, 829 (Ct.App.1994) (to the extent a party may wish to rely on an applicable presumption, it should make such wish known in the trial court so party opposing the presumption may rebut it).

7.  The City recognized its problems with the preservation of this issue during oral argument before this Court, and we hold that this issue has been foreclosed by lack of preservation.

### B.  *Manner of Applying Montoya*

8.  Before determining whether to apply *Montoya* retroactively to this case, we must determine what *Montoya* means, which will necessarily determine whether the judge correctly applied the principles set forth in that case when he allocated the proceeds of the third-party settlement in an equitable fashion.  The question raised is whether the pertinent statute contemplates an apportionment of the settlement proceeds between the City and Worker in circumstances when there is not enough to go around and in circumstances where there is no contention from either party that the settlement was an unfair or inequitable compromise of the third-party claim.

9.  The facts of this case highlight the problem of when there is not enough to go around.  Of $140,000 recovered in the tort settlement, Worker paid $47,530.70 for attorney fees and related costs.  Worker owes another $15,221.78 for doctor's bills not covered by workers' compensation.  From the balance (approximately $77,000), the City seeks reimbursement for all the benefits it has paid out as well as a credit for any benefits it may owe in the future.  That

reimbursement may well equal or exceed all that is left of the tort settlement.  If so, Worker will retain nothing at all or a marginal sum at best.

10.  The issue we confront is whether the statute or *Montoya's* interpretation of it contemplates such a result.  Since the rights and obligations of parties in workers' compensation cases are entirely dependent on statutes in the first instance, we should look first to the applicable statute.  *See generally Pena v. Phelps Dodge Chino Mines*, 119 N.M. 735, 738, 895 P.2d 257, 260 (Ct.App. 1995).  The applicable statute dealing with the subject of a worker's rights when third-party tortfeasors are involved was enacted in 1929 and, with minor changes in wording and punctuation, has remained consistent since then.  The 1929 Act read as follows:

> The right of any workman, or, in the case of his death, of those entitled to receive payment or damages for injuries occasioned to him by the negligence or wrong of any person other than the employer as herein defined shall not be affected by this act, but he or they, as the case may be, shall not be allowed to receive payment or recover damages therefor and also claim compensation from such employer hereunder, and in such case the receipt of compensation from such employer hereunder shall operate as an assignment to the employer, his or its insurer, guarantor or surety, as the case may be, o[f] any cause of action, to the extent of the liability of such employer to such workman occasioned by such injury which the workman or his legal representative or others may have against any other party for such injuries or death.

1929 N.M. Laws, ch. 113, § 24 (in pertinent part).  The 1987 Act, under which this case should be decided, reads as follows:

> The right of any worker or employee or, in the case of his death, of those entitled to receive payment or damages for injuries or disablement occasioned to him by the negligence or wrong of any person other than the employer or any other employee of the employer, including a management or supervisory employee, shall not be affected by the Workers' Compensation Act [Chap-

ter 52, Article 1 NMSA 1978] or the New Mexico Occupational Disease Disablement Law, but the claimant shall not be allowed to receive payment or recover damages for those injuries or disablement and also claim compensation from the employer. In such case, the receipt of compensation from the employer shall operate as an assignment to the employer or his insurer, guarantor or surety of any cause of action, to the extent of payment by the employer to or on behalf of the worker or employee for compensation or any other benefits to which the worker or employee was entitled under the Workers' Compensation Act or the New Mexico Occupational Disease Disablement Law and which were occasioned by the injury or disablement, which the worker or employee or his legal representative or others may have against any other party for the injury or disablement. Section 52-5-17.

11. Although both provisions contain considerable repetition and legalese, if we eliminate the excess baggage from them, they do four things. First, they make it clear that the receipt of compensation does not preclude a suit against a person other than the employer, i.e., a third-party tortfeasor. Second, they make it clear that workers suing third-party tortfeasors may not have the double recovery of both the tort damages and the compensation benefits. Third, they explain how this prohibition on double recovery is accomplished—by assignment of the cause of action to the employer. Fourth, they limit the assignment; the assignment is limited under current law "to the extent of payment by the employer to ... the worker ... for compensation ... benefits." We do not consider it significant that the method of assignment is not traditional assignment or even an assignment of the cause of action, as the statute states, but is rather a reimbursement or an assignment of the recovery. *See Montoya*, 114 N.M. at 355-56, 838 P.2d at 972-73 (despite assignment language, statute contemplates reimbursement), 114 N.M. at 357, 838 P.2d at 974 ("by virtue of such assignment the employer is reimbursed").

12. Notwithstanding the plain language of the statute prohibiting a double recovery

and establishing as the method of prohibition an assignment of the tort recovery to the employer to the extent the employer paid compensation, the Supreme Court in *Castro*, 74 N.M. at 254, 392 P.2d at 668, ruled that the statute embodied an election of remedies so that workers who filed tort actions forfeited their entitlement to compensation benefits. In reviewing the continuing vitality of the *Castro* rule, the Court in *Montoya* began with the plain language of the statute and noted that it contained no election language. 114 N.M. at 357, 838 P.2d at 973. It next noted the prohibition against double recovery and explained that the broad objective of the statute was achieved by language stating that payment of compensation benefits would operate as an assignment of the cause of action "pro tanto for the payments made" of such benefits. *Id.* Black's Law Dictionary defines "pro tanto" as "[f]or so much," "for as much as may be," or "as far as it goes." Black's Law Dictionary 1222 (6th ed. 1990). In other words, pro tanto means "to the extent of" in the statutory language.

13. *Montoya* involved a person who was seriously injured in a work accident and who settled with the third party for a mere $7500. *Montoya*, 114 N.M. at 354-55, 838 P.2d at 971-72. The issue was whether this settlement operated as an election of remedies so that the worker would forfeit substantial compensation benefits. Once the Supreme Court decided that there was nothing in the language of the statute that should operate as an election and, importantly, that the reimbursement aspect of the statute would alleviate the danger of double recovery, the overruling of *Castro* followed naturally, and the Court said as much. 114 N.M. at 357, 838 P.2d at 974.

14. We recognize that the *Montoya* opinion contains language about "equitable distribution of loss" and "equitable allocation of responsibility." 114 N.M. at 357, 838 P.2d at 974. We believe that this language, rather than requiring or even allowing an allocation of the settlement proceeds in accordance with a judge's sense of equity, merely reflects the inherent equity in allowing workers to recover from the third parties responsible

for their injuries. Larson states the general rule as follows:

> When compensable injury is the result of a third person's tortious conduct, all statutes preserve a right of action against the tortfeasor, since the compensation system was not designed to extend immunity to strangers. To avoid a double recovery by the employee, all but three statutes provide varying systems with the general effect of *reimbursing the employer for his compensation outlay and giving the employee the excess of the damage recovery over the amount of compensation.*

2A Arthur Larson, *The Law of Workmen's Compensation* § 71.00, at 14–1 (1993) (emphasis added). (At the time of writing, the other three states had no reimbursement statute at all. Larson, *supra*, § 71.30, at 14–80.) Further:

> The obvious disposition of the matter is to give the employer so much of the negligence recovery as is necessary to reimburse him for his compensation outlay, and to give the employee the excess. This is fair to everyone concerned: the employer, who, in a fault sense, is neutral, comes out even; the third person pays exactly the damages he would normally pay, which is correct, since to reduce his burden because of the relation between the employer and the employee would be a windfall to him which he has done nothing to deserve; and the employee gets a fuller reimbursement for actual damages sustained than is possible under the compensation system alone.

Larson, *supra*, § 71.20, at 14–5 to 14–13 (footnotes omitted). It was this principle that we believe the Supreme Court was trying to capture with its language about equity in *Montoya.*

■ 15. It is a familiar principle of statutory construction that a court cannot change statutory language or construe a statute to mean something other than what it says. *See, e.g., Garcia v. Schneider, Inc.,* 105 N.M. 234, 236, 731 P.2d 377, 379 (Ct.App. 1986). This is sometimes known as the "plain meaning" rule, and it has been recently contrasted with the "rejection-of-literal-language" approach. *State ex rel. Helman v. Gallegos,* 117 N.M. 346, 347–48, 871 P.2d 1352, 1353–54 (1994). However, as *Helman* makes clear, the rejection-of-literal-language approach is to be used only when the plain meaning of the statute does not appear to express the legislative intent. *Id.* at 353–54, 871 P.2d at 1359–60.

■ 16. We find nothing in a literal reading of the statute that would be contrary to the legislative intent to permit third-party tort actions while prohibiting double recovery. Indeed, reading the statute to mean what it literally says is consistent with workers' compensation acts throughout the country, as noted by Larson. Larson, *supra,* §§ 71.00, 71.30.

17. Nor are we persuaded by the use of the word "subrogation" in the title of the statutory section. We recognize that we relied on the use of the word "subrogation" in another case raising the issue of reimbursement, but arising out of different statutes. *See White v. Sutherland,* 92 N.M. 187, 585 P.2d 331 (Ct.App.), *cert. denied,* 92 N.M. 79, 582 P.2d 1292 (1978). However, we do not believe that the rationale of *White* affords Worker any relief here. First, to the extent that *White* appears superficially similar, we point out that the *White* case was dealing with a federal reimbursement statute, and the opinion expressly held that "As to the *amount* of reimbursement, this statute says nothing." 92 N.M. at 190, 585 P.2d at 334. Moreover, the *White* case was dealing with a state statute providing, in the body of the statute, for subrogation "to the extent . . . [of] payment." *Id.* This Court held that the equitable nature of the remedy of subrogation had to be read together with the words "extent of payment" and that such equitable nature modified those words so that "extent of" did not mean 100%. *Id.* Importantly, however, in *White,* subrogation was part of the actual wording of the statute. In this case, in contrast, the word "subrogation" appears only in the title. The title of a statute cannot be used to interpret a statute that is otherwise clear in language in the body of the statute. *State v. Ellenberger,* 96 N.M. 287, 288, 629 P.2d 1216, 1217 (1981). As we have said, although the statute here at issue contains a fair amount of excess verbiage, a

careful reading shows clarity of both purpose and method.

18. In addition, when the legislature wishes to provide less than a pro tanto reimbursement, it certainly knows how to do so. *Taylor v. Delgarno Transportation, Inc.*, 100 N.M. 138, 667 P.2d 445 (1983) involved the situation where the employer sought reimbursement from a tort recovery, even for the portion for which employer was at fault. The *Taylor* court held that the statute at issue in this case provided for reimbursement for all compensation paid by the employer. 100 N.M. at 141, 667 P.2d at 448. The legislature responded with NMSA 1978, Section 52–1–10.1 (Repl.Pamp.1991), providing one instance in which the employer would not be entitled to pro tanto reimbursement—the instance in which the employer was at fault for the injury. The legislature having spoken to the situation in which the employer is at fault, we should not extend nonreimbursement to other situations in which the legislature has not spoken. *See State v. Lucero*, 114 N.M. 460, 462, 840 P.2d 607, 609 (Ct.App. 1992).

19. We have often said, particularly in the workers' compensation context, that certain situations call for legislative therapy, not judicial surgery. *E.g., Johnson Controls World Servs., Inc. v. Barnes*, 115 N.M. 116, 122, 847 P.2d 761, 767 (Ct.App.), *cert. denied,* 115 N.M. 79, 847 P.2d 313 (1993); *Moreno v. Las Cruces Glass & Mirror Co.*, 112 N.M. 693, 696, 818 P.2d 1217, 1220 (Ct.App.1991). The statute that we interpret here calls for reimbursement to the extent of payment of benefits. This statute is consistent with statutes in most other states that have such statutes. *See* Larson, *supra,* § 71.00 (quoted above and describing the statutes); § 71.30 (pointing out that three states had no reimbursement statutes at all at the time of writing). If the extent of reimbursement is to be based on some equitable formula, we believe it would be appropriate for the legislature to set forth the formula, as it has done in so many other portions of the Workers' Compensation Act. *See, e.g.,* NMSA 1978, § 52–1–20 (Repl.Pamp.1991) (average weekly wage); § 52–1–26.1 to –26.4 (formula for adding factors to impairment rating); §§ 52–1–41 to –43 (number of weeks of benefits and scheduled injuries). The workers' compensation judge here picked one formula; Judge Bosson's dissent suggests that another formula might equally be used. This appears to be a classic example of a matter calling for legislative action.

20. Finally, we do not believe that there is anything in the dispositive sentences of *Montoya* that would allow an equitable allocation of the settlement in this case. *Montoya* states, "If fairness of the amount is contested, the workers' compensation judge must hold a hearing to determine whether the amount paid to satisfy the third-party claim comports with the proportionate fault of the third party and with a reasonable compromise of the liability of that party." 114 N.M. at 358, 838 P.2d at 975. Although Worker's tort recovery did not fully compensate her for all of her damages, the fairness of the amount of settlement was not contested in this case. In fact, during oral argument, Worker's counsel appeared to be of the opinion that the settlement was pretty good or pretty fair to Worker, and the judge below expressly found that the settlement was a reasonable compromise. Worker got 38% of what she estimated her damages to be in a case in which she was the one who slipped on debris that likely was in plain view at a construction site; one of Worker's previous attorneys estimated her percentage of fault for purposes of settlement to be in the 20–30% range; and there was an admitted problem in the proof of the severity of Worker's injuries in that she had seen 22 or 23 doctors. Thus, *Montoya* would not call for a hearing in this case and, even if it did, there would be no basis on which to hold the settlement not proportionate to the fault of the third party or not a reasonable compromise of the claim.

21. For all the foregoing reasons, *Montoya* should be read to mean what the statute says—employers are to get a pro tanto reimbursement from a worker's tort recovery to the extent that the employer has paid compensation benefits.

## C. *Retroactive Application of Montoya*

■ 22. The Supreme Court in *Beavers v. Johnson Controls World Servs., Inc.,*

118 N.M. 391, 881 P.2d 1376 (1994), set forth the standard for determining whether a new court decision should be applied retroactively to all pending civil cases or only to cases filed thereafter. First, the court must determine whether "a new rule [has been] adopted by a judicial decision in a civil case." *Id.* at 398, 881 P.2d at 1383. We can agree that *Montoya* is a new rule because it changed the effect of a tort settlement on continuing workers' compensation obligations. With a new rule, *Beavers* recognizes a presumption that the rule will apply retroactively to all pending cases. To overcome this presumption, a party must show a sufficiently weighty combination of what the Court called the *Chevron Oil* factors. *Id.* (citing *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)). Those are: (1) the clear and unforeseen break that the new rule makes; (2) the history of the rule and whether retrospective operation would further its operation; and (3) factors of equity. *Id.*

23. The City relies primarily on the third element and argues that it relied on the old rule from *Castro*. Before addressing the third of the *Chevron Oil* factors, we briefly discuss the first two. While the overruling of *Castro* was a clear break from prior law, in light of the lack of statutory support for the *Castro* holding, it was perhaps inevitable and foreseeable that our Supreme Court would overrule it. As the *Montoya* court indicated, the *Castro* rule was based on a fiction with little statutory support. The unfairness of the *Castro* rule was patent. The essential fairness of the *Montoya* rule, as that fairness is described in the passages from Larson quoted above, would therefore be furthered by retrospective operation.

24. As to equity or hardship, the City makes a generalized argument of prejudice: It claims it expected relief from all future obligations once the Thermal action settled. Therefore, the City alleges it elected not to invest much time and effort in investigating Worker's case and in preparing a defense. It alleges that evidence was lost because of this. Moreover, it alleges that it did not monitor the settlement of the Thermal litigation. However, there is no contention of how the outcome of the Thermal litigation would

have been different had the City monitored it.

25. All of the City's allegations of prejudice relate to its contention, made below, that Worker should be estopped from collecting any more compensation from the City and should be estopped from reimbursing the City for anything less than the full compensation paid to the extent of the settlement. In the only finding related to the City's estoppel argument, the judge expressly found that the "predicates for application of equitable estoppel do not exist in this case." The judge having expressly made a finding that the facts did not exist to support the City's theories of prejudice on which the City bore the burden, the question on appeal is whether it was rational for the judge to have so found. *See Gomez v. Bernalillo County Clerk's Office*, 118 N.M. 449, 452, 882 P.2d 40, 43 (Ct.App.1994).

26. The City's generalized allegations, without specific references to the record showing where it proved its allegations of prejudice, do not compel a reversal of this issue on appeal. *See Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203, 209, 880 P.2d 300, 306 (1994) (argument must contain citations to appropriate portions of the record that clearly show how the trial court erred); *State v. Hoxsie*, 101 N.M. 7, 10, 677 P.2d 620, 623 (1984) (assertion of prejudice is not showing of prejudice), *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989); *Blacker v. U–Haul Co.*, 113 N.M. 542, 545, 828 P.2d 975, 978 (Ct.App.) (generalized allegations of prejudice are insufficient), *cert. denied*, 113 N.M. 352, 826 P.2d 573 (1992).

27. Nor does Judge Black's reliance on the legitimacy of the City's legal defense of election of remedies establish prejudice. Had Worker's counsel promptly notified the City of the settlement, this case in all likelihood would simply have followed the procedure of *Montoya*. That is: the City would have moved to dismiss; the judge would have granted the motion; Worker (her attorney knowing of the existence and procedural posture of *Montoya*) would have appealed to this Court; we would have followed *Castro* and affirmed, as we did in *Montoya*; and Worker

would have petitioned for certiorari. There is no reason to suppose that the Supreme Court would not have taken this case and would not have decided it in the same fashion as *Montoya.* Thus, this aspect of the case does not justify an absence of retroactivity.

28. On balance, therefore, the judge correctly applied the presumption of retroactivity in deciding that *Montoya* should govern this claim. His decision on this issue is affirmed.

### III. *CONCLUSION*

29. We affirm the retroactive application of *Montoya* to this case. We affirm the disposition regarding the release. We remand, however, for further proceedings. The judge is instructed to award the City a pro tanto reimbursement for sums it expended on benefits paid to Worker in the past and to credit the City for any future benefits to be paid to the extent that there are funds available from the third-party tort settlement.

30. IT IS SO ORDERED.

BLACK, J., concurs in parts I and II A & B and dissents in part.

BOSSON, J., concurs in parts I and II A & C and dissents in part.

BLACK, Judge (concurring in part and dissenting in part).

1. I concur in Judge Pickard's opinion, except I would not apply *Montoya v. AKAL Security, Inc.,* 114 N.M. 354, 838 P.2d 971 (1992), retroactively based on the record in this case.

2. Employer's efforts to settle this case began in July 1988. Employer negotiated with both of Worker's first two attorneys before Worker employed present counsel. On September 7, 1990, the parties filed a joint motion to vacate the September 25, 1990, formal hearing. In the motion, the parties stated that the possibility of settlement was "very good" but that they were awaiting resolution of Worker's third-party claim before final settlement. Employer was aware of the clearly established New Mexico legal precedent holding that the settlement

of the third-party claim would eliminate Worker's claim for compensation. *Castro v. Bass,* 74 N.M. 254, 392 P.2d 668 (1964). Thus, all Employer's settlement negotiations were premised upon the assumption that once the third-party tort case was resolved Employer would be entitled to reimbursement for past benefits and would not be liable for any further compensation benefits.

3. During the next several months, Worker's counsel failed to respond to Employer's repeated inquiries regarding the status of the third-party suit. At a formal status conference, however, Worker's counsel indicated settlement of the third-party claim was expected shortly. The workers' compensation hearing was then rescheduled for February 11, 1992.

4. Employer attempted to contact Worker's counsel in January 1992 and was informed she would be in trial in Texas "for a few months." After conferring with the attorney who handled calls for Worker's counsel in her absence, Employer agreed to a second stipulated motion to vacate the formal hearing. Again, the parties mutually represented to the Worker's Compensation Judge that they were "very close to settlement." The motion to vacate was granted and the case was rescheduled for formal hearing on April 24, 1992.

5. About the time Employer was attempting to get in contact with Worker's counsel, the third-party claim was being settled. On or about January 10, 1992, Worker settled her third-party claim. At that time, of course, the law remained as it had been for almost thirty years that Worker's settlement with the third-party tortfeasor would terminate Worker's claim for compensation and require reimbursement of the Employer. *See, e.g., Apodaca v. Formwork Specialists,* 110 N.M. 778, 800 P.2d 212 (Ct.App.), *cert. denied,* 110 N.M. 749, 799 P.2d 1121 (1990).

6. On April 20, 1992, Employer moved to dismiss the Worker's compensation claim for failure to prosecute. Worker did not respond to Employer's motion. Employer continued to try to reach Worker's attorney but received no response. On August 4, 1992, Employer finally filed a Motion for Reim-

bursement on the basis that Worker had not responded to any of Employer's requests for information about the third-party claim, and might not be adequately protecting Employer's right to reimbursement. Formal hearing was scheduled for September 4, 1992.

7. On September 2, 1992, our Supreme Court filed the *Montoya* opinion. At the September 4th hearing, Worker for the first time revealed that she had settled her third-party claim. Nor was this a mere coincidence. At the oral argument before this Court, Worker's counsel revealed she was a friend of the attorney handling the *Montoya* appeal and knew the Supreme Court had agreed to review that case on certiorari. Counsel admitted it was her hope the Supreme Court would use *Montoya* to change the law long embodied in *Castro* and its progeny. Worker's counsel delayed in informing the Employer of the third-party settlement for nine months, until two days after the *Montoya* decision was entered.

8. Our Supreme Court has retained the guidelines for retroactive application of a new rule of law set forth in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *Beavers v. Johnson Controls World Servs., Inc.*, 118 N.M. 391, 398, 881 P.2d 1376, 1383 (1994). Pursuant to these guidelines, retroactive application of judicial decisions is determined on a case by case basis after examining the following factors: (1) whether the decision establishes a new principle of law; (2) the purpose of the new rule of law and the effect of retrospective application upon that purpose; and (3) how much reliance was placed upon the old rule and the effect retroactive application would have upon the administration of justice. *Chevron Oil,* 404 U.S. at 106–107, 92 S.Ct. at 355–356. I believe application of these factors precludes the retroactive application of *Montoya* to the present case.

9. As to the first factor, there can be no dispute that *Montoya* overruled *Castro* which had long been the established law in New Mexico. *Montoya,* 114 N.M. at 357, 838 P.2d at 974.

10. The second factor is the purpose of the new rule. The purpose of *Montoya* was to achieve an "equitable allocation of respon-

sibility." *Id.* This is a laudable goal, and I agree with Judge Pickard that it is the most likely intent of the original legislation. As this case indicates, however, there is a fair difference of opinion on how *Montoya* directs an equitable allocation of responsibility be accomplished. In the present case, retroactive application of *Montoya* does not serve to achieve an equitable allocation of responsibility because it would deprive Employer of a legitimate legal defense upon which it based four years of legal strategy and good faith bargaining. *Cf. Lopez v. Maez,* 98 N.M. 625, 632, 651 P.2d 1269, 1276 (1982) ("If the new law imposes significant new duties and conditions and takes away previously existing rights, then the law should be applied prospectively."). The retroactive application of *Montoya* in this case would also reward Worker for failing to reveal the third-party settlement for almost nine months.

11. That brings me to the third and, on the present facts, most critical of the *Chevron* factors: reliance on existing law. Employer in this case justifiably relied on the *Castro* rule in evaluating and preparing its defense. Had Employer not believed that Worker had elected her remedy its attempts to provide vocational training and job placement would likely have been different. Moreover, if Employer had not relied on existing law, that its liability would be extinguished upon settlement of the third-party claim, Employer would not have relied on Worker's repeated representations that the third-party settlement was imminent and would not have consistently agreed to continue the various formal hearings in this matter. Therefore, if Employer had been timely provided the information it repeatedly sought on the third-party settlement it could likely have enforced its rights under *Castro;* before *Montoya* changed the law.

12. In *Beavers,* our Supreme Court recognized that different policy issues inform the analysis of the reliance factor in tort than in contract cases:

The reliance interest to be protected by a holding of nonretroactivity is strongest in commercial settings, in which rules of contract and property law may underlie the negotiations between or among parties to a

transaction. Upsetting what may very well be the legitimate expectations of one or more of the parties under the rubric of 'treating similarly situated parties the same' may simply be unjustified.

*Id.* at 399, 881 P.2d at 1384 (citations omitted). An employer's right to reimbursement is the right to receive back what has been paid to another and creates a conditional debtor-creditor relationship between the employer and the injured worker. *Transport Indem. Co. v. Garcia,* 89 N.M. 342, 345, 552 P.2d 473, 476 (Ct.App.), *cert. denied,* 90 N.M. 9, 558 P.2d 621 (1976). The reliance factor is, thus, critically important in this case which involves settlement negotiations conducted in good faith and based in concepts of implied contract. Employer relied upon long-established law and should not be punished because of its reliance on Worker's consistent representations that the third-party settlement was close and her silence after the event.

13. I would not retroactively apply *Montoya* to the present facts, but if it is to apply, I agree with Judge Pickard's interpretation of that case. I do not believe our Supreme Court intended to ignore the language of NMSA 1978, Section 52–5–17 (Repl.Pamp. 1991) in *Montoya,* and I believe Judge Pickard's application of *Montoya* is most faithful to the statutory language.

BOSSON, Judge (concurring in part and dissenting in part)

1. I concur in that part of the majority opinion which affirms the decision of the workers' compensation judge (WCJ) to apply *Montoya v. AKAL Security, Inc.,* 114 N.M. 354, 838 P.2d 971 (1992), retroactively. I also agree with the disposition of the preservation issue. However, because I disagree with the majority's application of *Montoya* to this case, I dissent from Section II(B) of the opinion. In my view, this Court misapplies *Montoya* to arrive at an inequitable result.

2. In *Montoya,* our Supreme Court held that settlement of a tort claim against a third party would not automatically terminate

workers' compensation benefits, overruling the rule of election imposed in *Castro v. Bass,* 74 N.M. 254, 392 P.2d 668 (1964). *Montoya,* 114 N.M. at 357, 838 P.2d at 974. *See generally* Vickie R. Wilcox, *WORKERS' COMPENSATION LAW—Pursuing the "Benevolent Purpose" of New Mexico's Workers' Compensation Statute as a Reimbursement Statute: Montoya v. AKAL Security, Inc.,* 24 N.M. L.Rev. 577 (1994). Given the small amount of the settlement ($7500 total damages for a severe assault), the Court in *Montoya* was not asked to apportion proceeds between the worker and the employer. The worker focused on reinstating her workers' compensation coverage. *Montoya,* 114 N.M. at 355, 838 P.2d at 972. The employer was not concerned about an incidental reimbursement from proceeds but rather that a low settlement had unfairly compromised its only hope for full reimbursement.[1]

3. The Supreme Court answered both concerns. Henceforth, settlement of a claim against a third party would not necessarily terminate workers' compensation coverage; it would only create a rebuttable presumption to that effect. *Montoya,* 114 N.M. at 358, 838 P.2d at 975. Additionally, the employer would be afforded an opportunity to challenge the reasonableness of the settlement. *Id.* If it were found to be unreasonably low, the WCJ could adjust the employer's right of reimbursement and fashion a credit in the employer's favor. *Id.* The Court did not discuss what would happen with settlement proceeds because it was not an issue in *Montoya.*

4. The case before us raises that very issue. Employer does not challenge the fairness or the amount of the settlement as *Montoya* permits. The workers' compensation benefits do not automatically terminate, again as *Montoya* provides. The question left unanswered is what happens to the proceeds. The issue before us is whether the WCJ erred in allocating the proceeds of a tort settlement between Employer and Worker. We should resolve this question by

---

1. Taking judicial notice of this Court's own files, it is noteworthy that at the time Ms. Montoya settled with the third party for only $7500, she

had received $88,000 in compensation benefits. The low settlement eliminated any realistic hope of reimbursement for those benefits.

applying the equitable principles of *Montoya* in a manner consistent with that opinion.

5. The facts of this case illustrate the problem. Of $140,000 recovered in the tort settlement, Worker paid $47,530 for attorney fees and related costs. Worker owes another $15,221 for medical bills not covered by workers' compensation. From the balance (approximately $77,000), City seeks reimbursement for all the benefits it has paid out as well as a credit for any benefits it may owe in the future, less City's proportionate share of attorney's fees and costs. *See Transport Indem. Co. v. Garcia,* 89 N.M. 342, 552 P.2d 473 (Ct.App.), *cert. denied,* 90 N.M. 9, 558 P.2d 621 (1976). Under the facts of this case, the reimbursement may well equal or exceed all that is left of the tort settlement. Yet, Worker suffered substantial, lasting injuries (e.g., lost wages, lost earning capacity, pain and suffering), some of which are not compensated at all under workers' compensation benefits or only partially so. If the City takes the entire tort settlement, Worker will be left with no compensation for these additional injuries. Only the City and Worker's own attorney would benefit from the settlement. Worker gains nothing for her efforts in pursuing the third-party litigation.[2]

6. There may be occasions which justify full reimbursement for employer. An example would be when a modest workers' compensation benefit is dwarfed by a substantial tort recovery. Even if the employer received total reimbursement in that hypothetical case, the worker would still be left with a substantial sum. But the same result does not necessarily follow when worker receives an amount in the tort settlement which is less than the total compensation benefits paid out, and yet the worker suffers a substantial, uncompensated injury of a continuing nature. Total reimbursement to the employer, leaving nothing for the worker, then becomes an "[in]equitable allocation of responsibility," contrary to *Montoya.* I do not believe *Montoya* requires such a result.

7. Interpreting NMSA 1978, Section 52–5–17 (Repl.Pamp.1991) (effective until Jan. 1, 1991) of the Workers' Compensation Act, *Montoya* states that the "broader objective of the statute is to achieve an equitable distribution of the risk of loss." *Montoya,* 114 N.M. at 357, 838 P.2d at 974. The Court also speaks of the "purpose of Section 52–5–17 [being] equitable allocation of responsibility." *Id.*

8. Section 52–5–17 specifically permits third-party claims. Both the worker and the employer stand to benefit financially when worker sues a third party for contribution. Professor Larson has spoken about third-party claims as follows:

> The concept underlying third party actions is the moral idea that the ultimate loss from wrongdoing should fall upon the wrongdoer. As mentioned at the close of the preceding chapter, every mature loss-adjusting mechanism must look in two directions: it must make the injured person whole, and it must also seek out the true wrongdoer whenever possible. While compensation law, in its social legislation aspect, is almost entirely preoccupied with the former function, it is not so devoid of moral content as to overlook the latter. It should never be forgotten that the distortions of our old-fashioned fault concepts that have been thought advisable for reasons of social policy are exclusively limited to providing an assured recovery for the injured person; they have never gone on— once the injured person was made whole— to change the rules on how the ultimate burden was borne.

2A Arthur Larson, *The Law of Workmen's Compensation* § 71.10, at 14–1 (1993).

9. Employers and workers are less likely to achieve these goals with a system that

---

**2.** There is an indication in the record that Worker may have received almost $149,000 by July 9, 1995, based on an ongoing order of temporary total disability benefits dating from July 9, 1987. This includes $24,969.13 in medical expenses paid by Employer. The compensation order awarded temporary total disability until further order of the court and nothing in the record or the briefs indicates that the compensation order has been modified or superseded. However, there is another reference in the record that the claim is for $52,163. Either way, the majority opinion will leave Worker with little or nothing for having undertaken the risk and the labor of the third-party tort litigation.

works at cross-purposes. Conflict and inconsistency abound when workers get nothing for their efforts. Creating a disincentive for workers to proceed frustrates the employer's own interest in third-party recovery. This result cannot be what the legislature had in mind in crafting Section 52–5–17, nor can it be what our Supreme Court had in mind in *Montoya*. The principle of "equitable allocation of the risk of loss" must mean, at the very least, that settlement proceeds should be allocated equitably with an eye toward satisfying, not frustrating, the mutual interests of worker and employer. *See* Larson, *supra,* § 74.31(a) n. 25, n. 25.1, at 14–485 to 14–488 (setting forth statutes and case law in other states which provide worker a financial incentive to bring the third-party tort suit). As Professor Larson states:

> [A] good statute must recognize as a fact of life that the injured employee may need a little special solicitude to ensure that he adequately looks after his own rights . . . .

> In many situations, it is important for the statute to contain not merely an opportunity but an incentive to sue the third party, and particularly to strive for the fullest possible damage recovery.

Larson, *supra,* § 74.16(a), at 14–403.

10. The *Montoya* Court acknowledged that the statute "evinces a legislative intention to prevent windfall recoveries to injured workers." *Montoya,* 114 N.M. at 357, 838 P.2d at 974. However, as the Court pointed out, this concern is dealt with by the terms of the statute, by giving employer a right to reimbursement for benefits paid under the statute. *Id.* Thus, the Court opined that "the broader objective of the statute is to achieve an equitable distribution of the risk of loss." *Id.* The Court noted that with the adoption of comparative fault and the abrogation of joint and several liability in the early 1980s, it is no longer accurate to say that recovery from one third-party tortfeasor makes a worker financially whole. *Id.* In fact, other parties may have been responsible for the injuries, or the employer and the worker may have been partially at fault. *Id.* Thus, the Court rejected

the fiction that a worker has been made financially whole when the worker has received less than the compensation and related benefits to which entitled under the Act. If there is a problem with a satisfaction of the third-party claim, it does not go to double recovery. Rather, it goes to the amount of reimbursement or credit to which the employer is entitled.
*Id.* at 358, 838 P.2d at 975.

11. In *Montoya,* the Supreme Court observed that an employer's liability would be reduced by the amount of the settlement, unless employer could show that the amount was not a reasonable settlement based on either the proportionate fault of the third party or on other factors that make a settlement unreasonable. *Id.* The important point, in my view, is that the opinion specifically contemplates the possibility that the WCJ will order something other than a dollar-for-dollar setoff for employer, and I interpret that to be either up or down depending on equitable considerations.

12. The process of examining the real impact of the settlement begins when there is an initial showing that worker's net recovery (after fees and litigation costs) is less than employer's total claim for reimbursement. That showing was made in this case. If the City felt the settlement was unreasonably low, then under *Montoya* it could have asked the WCJ for an equitable adjustment. The City did not do so. The Worker should be able to request an adjustment the other way and did so in this case. *Montoya* requires the WCJ to consider both the proportionate fault of the tortfeasor and the reasonableness of the settlement in determining the extent to which employer will be reimbursed.

13. Proportionate fault is one appropriate consideration. On the one hand, if the entire injury were 100% the fault of one third-party and worker secures a reasonable settlement, then employer can make a strong case for 100% reimbursement of its benefits. On the other hand, if the settlement represents only 20% of the fault and the remainder of the responsibility lies with the worker or with absent tortfeasors, one can question the fairness of allowing employer a full recovery at the expense of the worker. The question

then becomes whether this could be an "equitable distribution of the risk of loss." Reimbursement to employer for what amounts to the worker's own percentage of the fault would seem to be a windfall, because, by statute, the employer is to indemnify worker even when worker causes the injury. Equity would seem to limit employer's reimbursement to the same percentage which represents the fault of others, apart from the worker or the employer. *See* NMSA 1978, § 52–1–10.1 (Repl.Pamp.1991); *cf. Taylor v. Delgarno Transp., Inc.*, 100 N.M. 138, 667 P.2d 445 (1983) (Payne, Chief Justice, and Sosa, Senior Justice, dissenting).

14. This interpretation of *Montoya* is also consistent with precedent in the area of equitable subrogation. Even a fully subrogated healthcare provider can be subject to equitable limits in seeking reimbursement from proceeds of a third-party tort settlement. *White v. Sutherland*, 92 N.M. 187, 192, 585 P.2d 331, 336 (Ct.App.) (Wood, C.J.), *cert. denied*, 92 N.M. 79, 582 P.2d 1292 (1978). In *White*, the tort settlement was low (only 10% of the victim's total damages) and the healthcare expenses were high. *Id.* at 189, 585 P.2d at 333. Under the circumstances, it would not have been fair for the healthcare provider to receive full reimbursement. *Id.* at 191, 585 P.2d at 335. Therefore, this Court limited the subrogated recovery to 10% of the healthcare benefits paid out. *Id.* at 192, 585 P.2d at 336. As an analogy, equitable subrogation permits us to search for a fair way out of an inequitable and self-defeating situation. The intent of Section 52–5–17 has been described in certain contexts as a subrogation statute. *See Castro*, 74 N.M. at 261, 392 P.2d at 674 (Noble, J., dissenting).

15. We should interpret this statute in light of changing tort law to achieve its overall purpose. When faced with illogical and onerous results, stemming from ambiguous statutory language written in an era preceding comparative fault, we should not feel intimidated from reasonable efforts to mitigate such a result. *See State ex rel. Helman v. Gallegos*, 117 N.M. 346, 348, 871 P.2d 1352, 1354 (1994). We should interpret Section 52–5–17 in light of the equitable principles set forth in *Montoya*. Employer and Worker must share in the allocation of proceeds. Based on the foregoing analysis, I think that the WCJ correctly interpreted Section 52–5–17 and *Montoya* to require the equitable allocation of settlement proceeds between the City and Worker.

16. After the fairness of the settlement amount was contested by Worker in her closing statement and in her requested findings of fact and conclusions of law, the WCJ determined total loss, including all claims for back wages, medical benefits, pain and suffering, and other tort damages. Comparing the actual settlement ($140,000) with the total loss ($367,000), the WCJ concluded that Worker was only compensated for 38% of her total damages. Then, following the analogy of equitable subrogation and *White*, the WCJ limited the City's recovery to a 38% reimbursement from the tort settlement.

17. There are other equitable ways of apportioning risk and reward. The WCJ could have determined the percentages of fault in the third party and Worker and limited the City's reimbursement to that percentage representing third-party responsibility for Worker's damages. Under *Montoya*, the WCJ is already required to make these assessments in determining whether a third-party settlement is a reasonable compromise of the third-party liability. This method has much to commend it.

18. However, the particular method of equitable allocation is less important than its exercise. In my view, that task should be left to the WCJ, subject to this Court's review. *Montoya* does not dictate the choice; *Montoya* dictates that there be a choice. I would affirm the WCJ for the manner in which he made that choice, seeking to bring sense and harmony to a chaotic situation.

19. For the foregoing reasons, being in the minority on this issue, I respectfully dissent.